## Tuttle *v.* Suznevich, Appellant.

Argued October 2, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES and COHEN, JJ.

*Charles McC. Barrickman,* with him *Wallover & Barrickman,* for appellant.

*Theodore A. Tenor,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, November 10, 1958:

Kenneth Tuttle, a child six years of age, was killed by an automobile owned and operated by Andrew A.

Suznevich. The boy's father, Ernest G. Tuttle, as administrator of the estate of the deceased, brought Wrongful Death and Survival actions against Suznevich. The jury returned a verdict of $10,000 in the death action and found for the defendant in the survival action. The defendant asks for judgment n.o.v. or a new trial.

On the morning of April 30, 1955, Ernest Tuttle was standing on the lawn of his neighbor, Shirden Cline, talking with him about a lawn mower with which they had been experimenting. The Cline property, located in Ohio Township, Beaver County, fronted on the east side of the Smith's Ferry Hill Road (also known as Route 278), which is some 18 feet wide, bare of sidewalks, and flanked on either side by a berm 5 feet wide. That morning, at about 11 o'clock, Ernest Tuttle saw the defendant, Andrew Suznevich, proceeding northwardly on the Smith's Ferry Hill Road, at the rate of from 30 to 35 miles an hour. At the moment of first vision Suznevich was about 79 feet away. Suznevich looked over at Tuttle as he drove by. A moment later Tuttle saw his little boy standing on the road, 18 inches within its outer edge on the margin of and adjacent to the driveway leading from the Cline property. In the next instant he saw the bumper of the automobile strike the child and the front and rear wheels pass over him. The body was carried or dragged for some 15 feet and the car traveled about 75 feet before it stopped. Suznevich then got out of the car, remarked to Mr. Tuttle that he thought he had run over a dog, and drove away. Later he returned and explained that he had left because he had been frightened by what he saw.

In his appeal to this Court Suznevich denies responsibility for Kenneth Tuttle's death because, he says, the plaintiff "has failed to show how the accident

happened." "The whole record," he asserts, "is devoid of testimony as to any basic facts absolutely essential for the determination of liability." But Suznevich's own testimony reveals how the accident happened. He testified "Q. How far does the Tuttle home sit back from the westerly portion of the road? A. About sixty-five feet. Q. Sixty-five feet? Will you tell the Court and jury, just in your own words, what happened as you came along that highway? A. Well, as I was traveling this road, the road—the day was clear and the road was dry, and I had traveled this road before, and when I felt that thump on my car—the back wheel—I knew I hit—Q. Where were you when you felt the thump on your car? A. Almost directly in front of Mr. Cline's home. Q. Would that be approximately where it has been testified as to where the impact took place? A. That's right. Q. And after you heard the thump, what else did you notice? You spoke about the wheel of your automobile? A. Yes, I knew my back wheel hit something, but I didn't know what it was. Q. *Up to that time, had you observed anyone in the highway?* A. *No, sir.* Q. Were you looking north as you were proceeding along there? A. At this certain point, yes." (Emphasis supplied)

The child was where he had a right to be. We said in *Neidlinger v. Haines,* 331 Pa. 529, 532, that: "In the absence of sidewalks the rights of pedestrians upon the highway are equal to those of motor vehicles; and a pedestrian walking along the right side of a paved roadway is not required to turn and look for approaching traffic . . . nor is he required to step off the highway to permit the automobile to pass." It was a clear day and the road was dry. Suznevich was thoroughly familiar with the environment and had often traveled over this road. Why did he not see Kenneth Tuttle who was 5 feet from the edge of the berm and 18 inches

within the road, a total of 6½ feet from the extremity of the right of way, next to an open space which the child would have had to traverse in order to get on the road? If the child approached the road from the east, he would have been in clear view of the motorist as he left the lawn, crossed the berm, and entered on the road. If he approached from the west, he would have had to cross 5 feet of berm and 16½ feet of road before arriving at the point where he was struck. In either event the defendant would be guilty of negligence in not seeing the child and in not stopping or turning the wheels of his car to avoid colliding with him.

Did Suznevich observe the rules of the highway as he moved forward? It will be noted that in answer to his lawyer's questioning as to whether he looked northwardly as he proceeded, he replied rather guardedly: "At this certain point, yes." But it was at this very point that he was *not* looking north.

We have the very positive testimony of Ernest Tuttle that just before Suznevich reached the boy, Suznevich was looking away from the road. Whether he got his vision back to the highway before the boy appeared on it is highly doubtful. His own testimony on this point is not reassuring: "Q. You say you felt something on your back wheel? A. Yes, sir. Q. And prior to that, where had you been looking? A. Prior to that? Q. Yes. A. I might have glanced in Mr. Cline's direction. Q. And the next thing you felt was this at your back wheel? A. The next thing, after I did straighten out my head, that is when—just before— just after I straightened out my head."

The answer is capable of two interpretations: one, that he straightened out his head after the impact— and the other that he straightened it before the impact. Obviously, if he did not straighten his head until after

the collision, his negligence is established conclusively. The eyes are imbedded in the forward part of the skull and when one turns his head to look to the side, the forward area of vision falls away as if over a precipice.

However, aside from the question as to when Suznevich straightened out his head, it is clear that he was not exercising that care which is required of motorists, especially in vicinities where children can be expected. "Q. . . . You knew people lived along the side of the road. A. Yes, sir. Q. You knew that there were no sidewalks? A. Yes, sir. Q. And you knew that pedestrians, in order to cross the road, would have to walk across it? A. Yes, sir. Q. *Including children?* A. *Yes, sir."* (Emphasis supplied.)

As cogently stated in *Frank v. Cohen,* 288 Pa. 221, 226, "It takes only the fraction of a second to get into trouble guiding an automobile." Further, "it required only the space of time his [the defendant's] eyes were off the road to cause the mischief and place the boy's [plaintiff's] life in danger."

No bond between people can be, or should be, closer than the union between a motorist's eyes and the road ahead. No woman could be more mortally jealous than a road wedded to a driver. Once the driver averts his eyes from the road to cast an admiring or appraising glance, elsewhere, once he wavers in his constant devotion to Madame Highway, she may punish him with dire misfortune. Suznevich's glance at the passing scenery has visited him with a troubling and costly lawsuit and, tragically, it has cost the life of an innocent child.

The defendant cites *Ebersole v. Beistline,* 368 Pa. 12, 16, where this Court said: "The evidence is insufficient to warrant recovery if it fails to describe, picture or visualize what actually happened sufficiently to enable the fact-finding tribunal reasonably to con-

clude that the defendant was guilty of negligence and that his negligence was the proximate cause of the accident."

But here there was no absence of description or failure of visualization of facts. There was not missing a vehicle to carry the evidence forward to an objective and intelligent verdict. The reconstruction of past events does not need to depend on a cloud of witnesses. Physical facts can speak with the precision of mathematicians; the position and condition of objects involved in violence may tell the story of what happened with the impartiality of recorded history.

Even so, we are not required in this case to reweave the fabric of reality from the frayed fragments of disaster. Here we have the testimony of one who actually was present both a moment before and at the exact moment of the fatal occurrence on Smith's Ferry Hill Road. That he was not there for a longer stretch of time does not detract from the reliability of the picture his testimony vividly etched. The law does not require that a witness must be present at the anvil of fate for any specific period of time before the hammer of tragedy falls. Just as an architect can reconstruct a Roman temple from a block of masonry which has defied the centuries, and as a paleontologist may re-create the animal kingdom of a geologic period from a fossilized skeleton or plant, so can one from a lightning moment of revelation relive the whole drama of a human experience.

From what Ernest Tuttle saw in that moment before Kenneth Tuttle's life was snuffed out, there can be no difficulty in re-enacting what preceded it. It is clear that the deceased Kenneth could not have gotten onto the highway without having traversed enough of the immediate terrain for Suznevich to have seen him before he felt his rear wheels passing over a body,

which he thought was that of a dog. We are satisfied that the jury did not go awry in concluding that what Tuttle saw as the car bore down and passed over his son constituted negligence on the part of the driver defendant.

The motion for judgment n.o.v. is refused. Nor is the defendant entitled to a new trial because the word "insurance" was innocently and inconsequentially mentioned by the plaintiff while he was under cross-examination. The plaintiff did not volunteer the reference to insurance. It was the manner in which defendant's counsel put his questions that the reference occurred: "Q. Did you know that Mr. Cline had been interviewed in reference to how the accident happened? A. Yes, he told me he was. Q. And did you know that Miss Thompson had been interviewed? A. Yes, I do, by the insurance man. I was told that, too. . . . Q. Did you not know, Mr. Tuttle, that there were parties interested in knowing something about how this accident happened? A. That is natural; I would know that. Q. You didn't seek out anyone to tell them this information? A. I tell you, the insurance man came to my place after the boy was killed, and he said he would be back—"

Before putting his question, cross-examining counsel might well have taken counsel of Proverbs, 26:27: "Whoso diggeth a pit shall fall therein; and he that rolleth a stone, it will return upon him."

And then the reference to insurance was innocuous since it did not point to any particular person, and certainly not to the defendant, as carrying insurance. Moreover, the Judge adequately instructed the jury on the matter.*

---

* On this subject, the following cases are illuminative: *Lambert v. Polen*, 346 Pa. 352; *Hendrickson v. Quaker City Cab. Co.*, 84 Pa. Superior Ct. 218; *King v. Keller*, 90 Pa. Superior Ct. 596; *McCaulif v. Griffith*, 110 Pa. Superior Ct. 522.

The defendant also asks for a new trial on the ground that the verdict of $10,000 was excessive. We are satisfied that the record amply justifies the verdict. It is also to be considered that the jury, by failing to render a verdict under the Survival action, probably intended to include the potential sum there involved in the verdict on the Death action since, in the end, both sums would go to the same person.

Judgment affirmed.

Mr. Justice BELL dissents and would enter judgment n.o.v.