**Thomas DOWNIE**

v.

**UNITED STATES LINES CO.**

**Civ. A. No. 27626.**

United States District Court
E. D. Pennsylvania.

June 23, 1964.

2. United States v. Angelet, 265 F.2d 155 (2d Cir. 1959).

3. 331 F.2d 995 (2d Cir. 1964).

See also 231 F.Supp. 197.

Freedman, Landy & Lorry, by Marvin I. Barish, Philadelphia, Pa., for plaintiff.

Rawle & Henderson, by Thomas F. Mount, Philadelphia, Pa., for defendant.

KRAFT, District Judge.

This action for damages under the Jones Act is before us on defendant's post-trial motions following a special verdict of a jury for the plaintiff.

The evidence was sufficient to establish the following: On November 5, 1958, plaintiff was employed as an electrician aboard the S.S. American Builder, a vessel owned and operated by the defendant, and then docked in the Port of London. Plaintiff awoke about 2 o'clock that morning with a sharp pain in his arm. He went to sleep again, and some time later awoke with a sharp pain in his chest which "shot across" his shoulder and all the way down his arm. On his way to the latrine, plaintiff had to stop and rest and, with the pain, he broke out in a sweat and became very weak. After stopping several times for rest, he got back to his bunk where he remained the rest of the night. Plaintiff awoke in the morning with similar pains, but arose, washed and went to the messroom.

Plaintiff began work at 8 o'clock, but felt himself getting weaker and his arm and chest felt sore. He complained to the first engineer who said "take it easy for the day, go to bed". Plaintiff then called to Pomerleau, the ship's purser, who also served as pharmacist's mate, and asked if he had any medicine for a sore chest and pain in the arm. At Pomerleau's direction, plaintiff went to the purser's office which was one deck above. Plaintiff told Pomerleau what he had experienced during the night, that his arm and chest were still sore and that he felt "awful" weak. Pomerleau instructed plaintiff to change his clothes and come back to his office.

On plaintiff's return, Pomerleau took him on deck and gave him directions to a clinic, which Pomerleau stated wasn't "very far". Pomerleau also handed plaintiff a letter addressed to the medical officer of the Albert Dock Hospital, to which Pomerleau had previously referred as the "clinic". The letter requested that plaintiff be examined and treated, and stated in part "He complains this morning of numbness left arm with pain in chest. During the night he stated pain quite severe with profuse sweating, etc. Possible cardiac complications?"

The hospital was approximately a mile from the vessel. Plaintiff walked the entire distance, stopping several times to rest. On his arrival, he was examined and then sent to a different hospital in

London, where he remained for three weeks. He was then returned to the United States where he was an inpatient at the Staten Island Marine Hospital for nine days. Thereafter, plaintiff received medical treatment at the Baltimore Marine Hospital as an outpatient until April 28, 1959.

It is not disputed that plaintiff suffered a heart attack in the early morning of November 5, 1958. The medical testimony, on both sides, as we understand it, indicates that plaintiff sustained a myocardial infarct caused by an occlusion or stoppage in the coronary arteries.

Plaintiff makes no claim that the heart attack itself was caused by any act or omission on defendant's part. He does contend, however, that the purser was negligent in permitting plaintiff to move about the ship and to walk to the Albert Dock Hospital after the purser knew, or reasonably should have known, of plaintiff's heart condition, and that this negligence aggravated the condition which resulted from the heart attack and caused plaintiff's present condition and a shortening of his life expectancy.

Defendant's first complaint is that the trial Judge erred in submitting to the jury the issue of plaintiff's claim for damages for diminution of his life expectancy.

Dr. Gelfand, plaintiff's medical witness, testified that plaintiff "had a heart attack when he awakened"; that in view of plaintiff's prior medical history, "the reasonable period of disability and convalescence in a case like Mr. Downie would be from three to four months. In other words, we would expect Mr. Downie to make a complete recovery within three to four months and to be able to return to his former work." He stated that plaintiff's heart muscle was damaged irreparably by his walk to the clinic during a very acute phase of his heart attack. He testified that plaintiff's life expectancy, already reduced to 70 per cent of normal by the heart attack itself, was further reduced to 20 to 30 per cent of that 70 per cent by the physical exertion attending plaintiff's walk to the hospital.

Dr. Soloff, defendant's medical witness, expressed the opinion that plaintiff's walk to the hospital had no aggravating effect on his heart attack, and no bearing on plaintiff's present condition or life expectancy. He testified that "it just doesn't seem likely to me that [the walk] is of any real significance at all".

The trial Judge submitted the issue to the jury with appropriate instructions. The jury, in answer to an interrogatory, stated that $25,000 of the total damages of $86,900 awarded plaintiff represented compensation for shortening of plaintiff's life expectancy.

Defendant contends that, under the law, plaintiff may not recover for shortening of life expectancy as a separate element of damages. After extended research and very careful consideration, we think defendant's contention is sound and must be sustained.

The Jones Act provides that any seaman who shall suffer personal injury in the course of his employment may maintain an action for damages at law " * * * and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply * * *." Section 1 of the Federal Employers' Liability Act, 45 U.S.C. § 51, states that a common carrier by railroad " * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce * * *." In Dow v. Carnegie-Illinois Steel Corporation, 165 F.2d 777, p. 779 (3rd Cir. 1948), a Jones Act case, the Court held:

"In proceedings brought under the Federal Employers' Liability Act the rights and obligations of the parties depend on the Act and the applicable principles of common law. New Orleans & N. E. R. Co. v. Harris, 247 U.S. 367, 38 S.Ct. 535, 62 L.Ed. 1167. It follows, therefore, that the measure of damages is as indicated by the Act and by the federal law."

We have found no case, under either the Federal Employers' Liability Act or the Jones Act, in which the question of reduction of life expectancy as an item of damages has been raised or considered. That very circumstance would seem to militate against the recognition of such an element of damage.

The English cases, beginning at least with Flint v. Lovell, 1 K.B. 354 (1935), do allow recovery for shortening of life expectancy as a separate and distinct element of damages. We have read most of the cases following Flint v. Lovell, but can see no reason to discuss them in detail. They are collected in a note at 131 A.L.R. 1351. Our residual impression, after careful study, is that the English Courts are not wholly satisfied with the rule allowing recovery. The subject, by its very nature, easily lends itself to abstract metaphysical speculation, wholly foreign to the essentially pragmatic approach of the law. As Viscount Simon remarked in Benham v. Gambling, a leading case: "The question thus resolves itself into that of fixing a reasonable figure by way of damages for the loss of a measure of prospective happiness. Such a problem might seem more suitable for discussion in an essay on Aristotelian ethics than in the judgment of a court of law, but in view of the earlier authorities we must do our best to contribute to its solution."

It seems to us that the English rule has evolved to the point where recovery is recognized more in theory than in fact. Our views accord with those expressed by Judge Wyzanski in O'Leary v. United States Lines Co., 111 F.Supp. 745, 747 (D.Mass.1953): "[T]he English rule has not proved to be entirely satisfactory in England. It has been so modified in practice that only small flat sums are now allowed."

The American cases appear uniformly to reject the English rule. See, Annot. 97 A.L.R. 823. We have found no case in which the shortening of life expectancy was recognized, clearly and unequivocally, as a separate and distinct element of damages. The general rule is stated at 25 C.J.S. Damages § 56, p. 546:

"The fact that plaintiff's life has been shortened by the injuries cannot be considered in assessing damages, although there is some authority to the effect that the jury may consider the fact that plaintiff's life is shortened, not for the purpose of determining the amount of damages, but for the purpose of determining the extent of the injury."

The Court of Appeals of Maryland recently dealt with the question for the first time in Rhone v. Fisher, 224 Md. 223, 167 A.2d 773 (1961). After consideration of Benham v. Gambling and other English cases, the Court refused to adopt the rule (167 A.2d p. 777):

"We recognize that there is some persuasiveness in the contention that the shortening of one's life by the negligent act of another should give the victim a right of recovery against the wrongdoer for that element of damage. The experience of the English courts with a rule permitting such recovery as a separate element of damages, as evidenced by Benham v. Gambling, supra, shows the extreme difficulty of stating or developing any satisfactory rule for the measurement of damages for such a wrong, and appears to have resulted in the rule being relegated to a matter of form, rather than substance, with a maximum allowance therefor in practice of about $1,400.

"The experience of the English courts with the rule and the virtual emasculation thereof which has evolved from that experience, as well as the rather ephemeral considerations which must be taken into account under it, and also the possible duplication or overlapping of compensation under this and other heads of damages (a possibility which Roche, L. J. thought had become in large part an actuality in Flint v. Lovell, supra) do not com-

mend the English rule to us as one for adoption in this State."

We find the Court's reasoning persuasive. Aside from other considerations, the adoption of the rule for which the plaintiff here contends would, in our view, inject new and highly speculative elements for the consideration of the fact-finders, often already confused by the complexities of the problems they are called upon to answer. To the prophetic task of determining life expectancy, too frequently on the basis of minimal evidence, would now be added the burden of determining the extent of any foreshortening. To the muddle of other uncertain items of damage would now be added that of attempted evaluation of years of life. True, judicial refuge might be had once more in the phrase "fair and reasonable compensation", but what is fair and reasonable for years of bliss or for years of hell on earth; and who can fairly or reasonably foretell which such years were to be. Too much is left to rosy surmise or dark conjecture —and this in a field where some reasonable evidential basis should support the fact-finding. There is no reason to believe that the English rule would prove any more satisfactory in practice here than it has in England.

Plaintiff refers to Sox v. United States, 187 F.Supp. 465 (E.D.So.Car.1960), an action under the Tort Claims Act for damages for prenatal injuries. The Court listed "deprivation of normal life expectancy" among the elements of damages, and awarded plaintiff a lump sum with no allocation among the items listed. There is no discussion of the question, no citation of authority, and it is not clear whether the Court regarded the deprivation of expectancy as a separate item of recovery, or as merely bearing on the extent of the injury. We do not regard the case as trustworthy precedent. Other cases submitted by plaintiff suffer from the same infirmity.

■ We conclude, then, that the trial Judge erred in submitting to the jury's consideration the issue of a shortening of plaintiff's life expectancy as a separate element in the determination of damages.

Defendant's only other complaint is that the trial Judge erred in admitting into evidence, over defendant's objection, certain statements contained in a volume entitled "The Ship's Medicine Chest and First Aid at Sea".

This book was required to be aboard the United States Lines' ships, and was, in fact, aboard the vessel here involved and available to the purser. The purser admitted that he did not refer to the book when plaintiff consulted him on the morning of his heart attack. Briefly, the statements admitted described the symptoms of coronary heart disease and emphasized the importance of "strict bed rest". The statements were offered and received for the limited purpose of showing the purser's knowledge, and the trial Judge carefully instructed the jury that the statements were not admitted as evidence of the truth of the matters asserted, or for any purpose other than to prove notice to the purser.

■ The statements were clearly admissible as circumstantial evidence of the purser's knowledge of the facts, and of the acts or omissions on his part which might constitute negligence. See 6 Wigmore on Evidence [3rd Ed.), § 1788, et seq. Whether in fact the statements were or were not correct was immaterial for the purpose of determining their admissibility. Their correctness was substantiated by the testimony of the medical witnesses on both sides at the trial. The trial Judge's ruling was not a violation of the hearsay rule, as defendant contends. The prohibition of the hearsay rule excludes extrajudicial utterances only when offered to evidence the truth of the matter asserted.

Smith v. Whittier, 95 Cal. 279, 30 P. 529 (1892), is directly in point. It was held in that case that a witness who ran an elevator, which had caused the injury in issue, could testify that he had been told that harm would come if he did not follow certain instructions, which he

detailed. The Court's reasoning is equally applicable here (30 P. 532):

"Whenever the knowledge or information of the party charged to have been negligent is a factor in determining such question [of negligence], it is proper, for the purpose of showing such knowledge or information, to show that notice was given to him, and that he was informed of the facts which would constitute negligence * * *. Whether in fact such information was or was not correct, is immaterial for the purpose of determining its admissibility, and hence it is no objection to its admission that it was not given under the sanction of an oath, or that the opposite party had not the opportunity of cross-examining the informant. The truth of the information is a distinct issue, and must be established by competent evidence; but upon the theory that the information was correct the plaintiff in the present instance had the right to show that the defendant had received such information * * *. Such evidence is admitted for the purpose of establishing merely the utterance of the words, and not their truth."

See, also, Crespin v. Albuquerque Gas & Electric Co., 39 N.M. 473, 50 P.2d 259 (1935).

The admission of this evidence, in any event, could not have prejudiced defendant, since the purser's knowledge was established by his own testimony at the trial. His letter to the clinic indicated at least a definite suspicion on his part that plaintiff's complaints might be the result of a heart condition. On cross-examination, he testified:

"Q From your own personal knowledge, do you know what the proper course of treatment is for a heart attack?

"A Yes.

"Q What is it?

"A Put the patient in bed and call a doctor.

"Q Do you know what this book says?

"A I have a general idea as to what that book says.

"Q And this book says 'Put the patient in bed and call the doctor,' too, doesn't it?

"A Yes, sir."

We conclude that there was no error in the admission of the evidence complained of, and that defendant's complaint is without merit.

Accordingly, we make the following

ORDER

Now, June 22nd, 1964, it is ordered that:

1. Defendant's motion to vacate and set aside the judgment be, and it is, denied.

2. Defendant's motion for judgment n. o. v. be, and it is, denied.

3. Defendant's motion for a full or partial new trial or modification of the amount of the judgment be, and it is, granted to the extent that the judgment is reduced from $86,900 to $61,900.