**Stella McSPARRAN, Administratrix of the Estate of Jacqueline M. Beattie, a minor, deceased,**

**v.**

**The PENNSYLVANIA RAILROAD COMPANY.**

**Civ. A. No. 31743.**

United States District Court
E. D. Pennsylvania.

July 14, 1966.

As Amended Aug. 5, 1966.

B. N. Richter, Philadelphia, Pa., for plaintiff.

Robert R. Artz, Philadelphia, Pa., for defendant.

### MEMORANDUM OPINION SUR PLAINTIFF'S MOTION FOR NEW TRIAL AND FOR DIRECTED VERDICT

VAN DUSEN, District Judge.

This case comes before the court on plaintiff's Motion For New Trial as to special questions Nos. 3 and 4 and plaintiff's Motion For A Directed Verdict as to special question No. 4 (Document 32), filed after the jury had answered the special questions [1] in such a way that the plaintiff was entitled to a judgment for compensatory, but not for punitive, damages. During the trial,

---

[1] The special questions, as answered by the jury, are as follows:

"1. Was the minor decedent, Jacqueline Beattie, negligent and did such negligence contribute in any part to her death?

Yes or No <u>No</u>

"2. Was any wanton misconduct of defendant's employees a substantial factor in causing the death of Jacqueline Beattie on May 9, 1962?

Yes or No <u>Yes</u>

"3. What are the damages recoverable by plaintiff?

A. Under Wrongful Death Act:

| | | |
|---|---|---|
| 1. Funeral Expenses (P–34) | $1666.75 | |
| 2. Loss of earning capacity, if any, to this date, less amounts paid by parents for maintenance and education | $ None | |
| 3 Present value of loss of earning capacity, if any, from this date to November 5, 1966, less amounts paid by parents for maintenance and education | $ None | |
| Total under Wrongful Death Act | | $ 1,666.75 |

B. Under Survival Act:

| | |
|---|---|
| Present value of future earnings from November 5, 1966, less probable cost of her own maintenance during the time she would have lived but for the accident | $13,505.20 |
| TOTAL OF A PLUS B | $15,171.95 |

"4. Was the death of Jacqueline Beattie caused wilfully or so carelessly as to indicate wanton disregard of her rights?

Yes or No <u>No</u> "

the defendant had admitted its liability both based on negligence under the F. E. L. A. and under the Safety Appliance Act in this suit for recovery under the Pennsylvania Wrongful Death Act (12 P.S. § 1601 ff.) and under the Pennsylvania Survival Act (20 P.S. §§ 320.601 and 320.603), arising from the tragic death of a 16-year old girl by a runaway freight car of defendant.

I. Motion for a directed verdict on the issue presented by Question No. 4 (liability for punitive damages) as surplusage and for a new trial on this issue (Special Question No. 4)

■ On this issue, which the jury decided for the defendant, the evidence must be construed in a light most favorable to the jury's "no" answer to the question.

The accident occurred in a suburban area on a single-track freight line which ran "more or less" downgrade (N. T. 50) toward Philadelphia, crossing three well-traveled highways (West Chester Pike, Township Line Road, and State Road— N. T. 87–88 & 91), as well as Cedar Lane (N. T. 90), before reaching the Garrett Road crossing where plaintiff's decedent was killed. The industrial train had cut off a gondola car and left it near the Llanerch freight station (N. T. 86) on the main track with the air brakes [2] applied in order to push a box car onto a side track where it was to be left. Although the air brake had been applied to the brakes on the gondola car, it started to move toward Philadelphia when the brakeman was still near enough to the car to put lumber under the wheels and board it before it had attained any considerable speed.

The following language from pages 1 and 2 of defendant's brief (Document 45) is supported by the record:

"On May 9, 1962 about 3:00 p.m. on a daylight and clear day plaintiff, age 16, was walking home from Bishop Pendergast High School accompanied by Julia Stampone, also age 16 (233). They were walking at a normal pace (254) on the gravel sidewalk parallel to Garrett Road, generally in an easterly direction, when they came to the Garrett Road railroad crossing over which is operated a single track of defendant's line of railroad. * * * [T]he plaintiff was struck by a runaway gondola car (P-1) while her friend, Julia, looked up in time to step back and avoid being struck (237) * * *.

"The defendant employees were performing their job normally in their usual manner as they had for many years when suddenly this car's brakes released and started to roll freely. The brakes of the gondola car had been checked in the usual manner prior to attaching this car to the train and they appeared to operate normally (64). The setting of this car on the main track with the airbrakes on was the normal operating practice (177). It was not standard operating procedure to use chocks as contended by plaintiff to block the wheels of cars parked temporarily on the main track,[3] and the railroad has never provided such chocks, although occasionally the men would block the wheels of cars on sidings with pieces of lumber or debris lying along the railroad (70, 79, 80). In fact, these men had been doing substantially the same operation daily five or six times a week for a period of ten years without a similar

---

2. Both the air brakes and the hand brake, which the brakeman Loscalzo attempted to apply when the car started to move (N. T. 84), proved to be defective.

3. If a car is going to be left unattended on this grade, the testimony justifies a finding that chocks and the hand brake, as well as the air brake, should be ap-

plied (N. T. 160), but the jury could well have inferred from the fact that the brakeman (Loscalzo) had the opportunity to both throw lumber under the wheels and get aboard this gondola car that he was not sufficiently far away from the car to justify a finding that it was left unattended.

incident (147, 170, 176). Immediately after the car started to roll an * * * effort [to avoid harm to the public] was made by the trainmen (165-6, 175, 328, 339), which included Andrew D. Loscalzo's jumping on the car and riding it to warn persons of the approaching car as it passed along the railroad track and over several street crossings (77, 83, 133–140)." [4]

The record, including the foregoing evidence, does not require a finding of liability for punitive damages as a matter of law. See Restatement of Torts, § 908, which has been cited with approval and followed by the Pennsylvania Supreme Court; [5] Scott v. Curtis, 200 Pa.Super. 44, 48, 186 A.2d 403 (1962); cf. Skeels v. Universal C. I. T. Credit Corporation, 335 F.2d 846, 852 (3rd Cir. 1964).

Section 908(1) of the Restatement of Torts reads:

"§ 908. PUNITIVE DAMAGES.

"(1) 'Punitive damages' are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct."

Comment b. contains this language: "Punitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with a reckless indifference to the interests of others."

The charge of the court on this issue (pp. 37–38 of Document 37) was in accordance with the foregoing authorities.[6] Plaintiff's contention that wanton misconduct and the conduct making one liable for punitive damages "are equated by the Pennsylvania decisions" (see pars. 8, 10 & 18 of Document 32) is rejected. Wanton misconduct, as defined in § 500 of the Restatement of Torts (2d) and in Evans v. Philadelphia Transp. Co., 418 Pa. 567, 212 A.2d 440 (1965),[7] is not the same as the "outrageous conduct [8] * * * done with a reckless indifference to the interests of others" (Chambers v. Montgomery, supra, 411 Pa. at 344, 192 A.2d 355, quoting from § 908 of Restatement of Torts) required for punitive damages. See, also, Hughes v. Babcock, 349 Pa. 475, 37 A.2d 551 (1944), as well as other cases referred to in footnote 5.

The application to strike interrogatory 4 as surplusage will be denied. It is noted that no such suggestion was made by plaintiff either when the special questions were submitted to counsel for comment (N. T. 441–458) [9] or at the end of the charge (N. T. 42–55 and 59–66 of Document 37).

Paragraph 14 of Motion For New Trial

The plaintiff contends that the jury should not have been permitted to hear evidence that railroad cars had never previously run away at this particular place on the issue of punitive

4. Before getting on the slowly moving ("creeping") car, he threw pieces of lumber under the wheel in an attempt to stop it (N. T. 77), and after he had climbed on it, the conductor also tried to stop the car with pieces of lumber thrown under the wheels (N. T. 87–88).

5. Chambers v. Montgomery, 411 Pa. 339, 344, 192 A.2d 355 (1963), and cases there cited, including Hughes v. Babcock, 349 Pa. 475, 481, 37 A.2d 551 (1944). See, also, additional Pennsylvania appellate court cases at pp. 14–15 of Defendant's Brief (Document 45).

6. The language at the top of page 38 of Document 37 was quoted from Thompson v. Swank, 317 Pa. 158, 159, 176 A. 211 (1934).

7. See recent discussion of this case in Goss v. Baltimore & Ohio Railroad Company, 355 F.2d 649 (3rd Cir. 1966).

8. The use of the term "outrageous conduct" as explained in the charge (see pages 37–38 of Document 37) was in accord with the Restatement of Torts (§ 908), the Pennsylvania cases (Chambers v. Montgomery, supra 411 Pa. at page 344, 192 A.2d 355), and the United States Court of Appeals for the Third Circuit (Skeels case, supra 335 F.2d at page 852).

9. The only request by counsel for plaintiff as to question 4 was granted (N. T. 453).

damages, and that the court erred in its charge on this point.[10] These contentions are without merit. The absence of prior accidents [11] is often admissible for the purpose of negating the inference that a defendant was on notice of the particular danger involved, see annotation in 31 A.L.R.2d 190, 208. Apparently there are no Pennsylvania cases directly on this point and counsel have cited none in their briefs.[12]

But although there may be some question as to whether evidence of absence of other accidents can be shown in Pennsylvania for some purposes,[13] such evidence is admissible on the issues of wilfulness and action so careless as to indicate wanton disregard of plaintiff's safety.[14] In Comment e. to § 908 of the Restatement of Torts, this language is used:

> "In determining the amount of punitive damages, as well as in deciding whether they shall be given at all, the trier of fact can properly consider not merely the act itself but all the circumstances including the motives of the wrongdoer, the relations between the parties, * * *."[15]

In the present case, it was proper for the defendant to show that the train crew was not acting with reckless indifference to the rights of others and that the train crew's conduct did not amount to "outrageous conduct" (as that phrase is used in the Restatement of Torts, § 908) by showing that the train crew had no reason to believe that its procedure was dangerous since no railroad cars had previously run away. Similarly, the absence of future accidents, when the same procedures were followed, is also relevant on the issue of bad motive.[16] It was also proper for the defendant to show, in defense of the claim for punitive damages, that the members of the train crew had reason to believe that they could halt a runaway car either by throwing lumber under the wheels or by means of the handbrake which they assumed was in proper working condition.

#### Special Questions 1 and 2 and Their Relationship to Question 4

Also, plaintiff has objected, since the trial judge instructed the jury, to the submission of Questions 1 and 2 to the jury, both because they were unnecessary and because they affected unfairly the answer to Question 4 (see N. T. 45 and 46–47 of Document 37 and pars. 9, 11 and 18 of Document 32). Such

---

10. See, particularly, the charge of the court at pp. 38–39 of Document 37.

11. It should be pointed out that the "accident" here referred to is the "accident" of having a car run away.

12. The case of Nixon v. Pfahler, 279 Pa. 377, 124 A. 130 (1924), however, indicates the attitude taken by the Supreme Court of Pennsylvania when faced with a somewhat similar problem. In Nixon v. Pfahler, at p. 379, 124 A. at p. 130, the court held that the doctrine of res ipsa loquitur did not apply to the use of an x-ray machine in a doctor's office. The court based its opinion to a large extent on the testimony of the doctor that "some 10,000 photographs had been taken by the same apparatus without injury * * *."

13. The case of Martucci v. Brooklyn Children's Aid Soc., 140 F.2d 732 (2nd Cir. 1944), holds that evidence of the absence of prior accidents is admissible, but in

so holding relied on the decisions of the State Courts of New York. The case of Schillie v. Atchison, Topeka & Santa Fe Railway Co., 222 F.2d 810 (8th Cir. 1955), holds that absence of other accidents cannot be shown in a Federal Court if the appropriate state law would exclude such evidence.

14. For cases in which absence of wilfullness, wantonness, recklessness, or gross negligence has been held admissible in mitigation of damages, see annotation in 75 A.L.R.2d 473, 481; see, also, 25 C.J.S. Customs and Usages § 19, p. 127.

15. This language was approved by the Pennsylvania Supreme Court in Chambers v. Montgomery, supra 411 Pa. at page 345, 192 A.2d 355.

16. Although plaintiff withdrew any contention of maliciousness after the close of the evidence (N. T. 453), he had not withdrawn this contention when this evidence was submitted to the jury.

objections must be overruled for these reasons, among others:

A. Counsel for plaintiff asked the trial judge to submit the issue of contributory negligence (Question 1) to the jury at the start of the trial (N. T. 16 and 23).

B. Counsel for plaintiff requested the trial judge to submit the issue of "wanton misconduct" under Evans v. Philadelphia Transp. Co., supra, to the jury during the trial (N. T. 7 & 8, 17–18 and 220–4), since he contended that if such wanton misconduct was found, "contributory negligence is not in effect" (N. T. 222). This contention made it necessary to submit question 2, in case question 1 was answered "yes."

C. After the proposed special questions (C–3) were submitted to counsel Monday morning, February 7 (N. T. 429–430), counsel were given an opportunity to discuss them (N. T. 431–2 & 442–462) and the only specific objection pressed by plaintiff to any parts of Special Question 1, 2 or 4 was directed to question 4, and the requested change was made by the trial judge (N. T. 453–8). Although counsel for plaintiff stated, when the proposed questions were distributed, "do you not think you have a duplication of 2 and 4," he raised no objection when it was explained that question 2 was to cover his previously stated (N. T. 222) contention under the Evans case, and when counsel were stating their objections to the question after lunch (N. T. 442 ff.), he did not make any objection when defendant's counsel asked the purpose of having both questions 2 and 4.

D. The questions (1, 2 and 4) were presented in a reasonably clear and non-confusing manner to the jury in the charge in accordance with the cases cited above.

II. *Question 3*

 The damages recoverable in this action are governed by the Pennsylvania law. Wiggins v. City of Philadelphia, 331 F.2d 521, 523 (3rd Cir. 1964). The Supreme Court of Pennsylvania has repeatedly held that:

"In cases under the Survival Act of 1937, supra, the jury should be directed to ascertain what the earnings of the deceased person would have been during the period of his life expectancy and to deduct from them the probable cost of his maintenance as shown by the evidence and to reduce the amount to its present worth." Murray v. Philadelphia Transp. Co., 359 Pa. 69, 74, 58 A.2d 323, 325 (1948).

See, also, Hankins, Admr. v. Mack, 364 Pa. 417, 421, 72 A.2d 268 (1950); Brodie v. Philadelphia Transp. Co., 415 Pa. 296, 303, 203 A.2d 657 (1964); Bernstein, "Damages in Personal Injury and Death Cases in Pennsylvania," 23 Pa.Bar Assn.Q. 9, 18 & 25 (1951), as supplemented in 26 Pa.Bar Assn.Q. 26, 27, & 32–35 (1954); Montgomery and Marshall, "A Survey of the Pennsylvania 'Wrongful Death' and 'Survival' Statutes," 25 Pa.Bar Assn.Q. 284, 295 (1954); Bernstein, "Has The Measure of Damages Under the Survival Act in Pennsylvania Been Modified?" 32 Pa. Bar Assn.Q. 47 (1960).

The charge of the court was based upon, and in accordance with, the above authorities. See N. T. 33–34 of Document 37.[17] Although the alleged errors of the trial judge in instructions on the measure of damages recoverable under the Survival Act has been one of the major bases of plaintiff's post-trial motions (see, for example, pars. 4, 20, 24 & 26 of Document 32 and Document 33) and of the arguments in plaintiff's post-trial briefs (see, for example, pp. 13 & 17 of Document 42), after repeated suggestions by the court, plaintiff's counsel has not been able to refer to any Penn-

---

17. The entire charge on amounts recoverable under the Survival Act (Question III–B) is at N. T. 32–37 of Document 37.

sylvania case stating that this Act includes any items other than the earnings of the decedent during her life expectancy, less the probable cost of her maintenance, which sum is to be reduced to present worth.[18] See, for example, authorities cited in plaintiff's Supplemental Brief docketed as Document 43, which was filed as the result of a discussion of this question at the argument on the post-trial motions,[19] and letter of April 22 attached thereto.[20] At page 13 of Plaintiff's Brief (Document 42), this language is used:

> "The true problem was:—how much would the estate actually have received? It would not have received merely the earnings that were accumulated year by year through the years. It would have accumulated the earnings plus the interest that that money earned through the years. Thus $1000. would accumulate $60 at the end of the year which would mean there would be $1060. When the next $1000 came in there would be an additional $60. The following year the interest would be figured on a $1060 plus the $1000 additional put into principal. The fund would then have $2,163.60. Just as the sum comes down tremendously in calculating present value from a given sum over a period of years, so it goes up tremendously as one uses the legal rate of interest in calculating how much the estate would have accumulated by the time all those years would have rolled around. The testimony given by Goodfarb never took into account the savings that came in year by year plus the interest added on principal to the savings and interest."

Again, at page 17 of the same brief, this language is used:

> "In the interim the savings on those earnings would have been accumulating interest, plus interest on the interest (compounded) through the years as they accumulated." (see, also, page 23 of Document 44).

However, the Pennsylvania Supreme Court has expressly rejected the contention that the Survival Act provides recovery for the probable accumulations which the decedent would have had left at the time of her death in Pezzulli v. D'Ambrosia, 344 Pa. 643, 26 A.2d 659, 662 (1942), using this language at page 649:

> "As to the ultimate viewpoint of the court in banc that the amount recoverable should have been limited to the probable accumulations by the deceased during his life expectancy,—that is to say, the present worth of what he would probably have left at the end of his life to his creditors, legatees and heirs,—this would introduce into the law of damages elements never heretofore recognized in Pennsylvania and would set up a standard impossible of practical ascertainment and having no logical relevancy to the nature of the action provided for in the 1937 act." [21]

---

18. At page 2 of his 1954 Article, Mr. Bernstein uses this language (26 Pa.Bar Assn.Q., 1, 2):
 "The writer is unaware of any decisional authority, or statement by any text writer, to the effect that the measure of damages is based on a principle other than here asserted, to wit, the loss of earning power of the injured person."

19. See pages 14, 18, 24 & 49–50 of partial transcript docketed as Document 44.

20. Cases such as Noel v. United Aircraft Corp., 359 F.2d 671 (3rd Cir. 1966), relied on in plaintiff's letter of April 22, attached to Document 43, construing 46

U.S.C. § 762, have no bearing on the construction of the Pennsylvania Survival Act, 20 P.S. §§ 320.601 and 320.603. 46 U.S.C. § 762 specifies that the recovery "shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought", which is approximately the recovery allowed under the Wrongful Death Act, whereas objection by the post-trial motions is made to the amount of the recovery under the Survival Act, which provides for a different measure of damages.

21. Relying on this language, Mr. Bernstein uses this language at pp. 8 and

Mr. Bernstein has used the following language on this subject at page 54 of his 1960 Article (32 Pa.Bar Assn.Q.), supra, at page 10:

"When Mr. Justice Bok said: ' * * * and it is *savings* that we must talk about *after applying the Murray rule*' (italics supplied), he surely must have intended the word *savings* to mean the amount that would have been *left over* from the probable earnings of the decedent had he lived, after the deduction of the probable cost of his maintenance, and not moneys which he would have accumulated from his earnings and appearing in his estate after his death. This is no more than a restatement of the *Murray* rule in slightly different words." [22]

Furthermore, there was no testimony indicating that a female teacher was likely to save, rather than spend, the return on her investments or savings, this was not argued to the jury (see N. T. 467–495), and the trial judge was not asked to charge on the point.

Actuarial testimony concerning present value of a sum to be received on May 9, 2022 (pars. 20, 24 & 26 of Motion For New Trial, being Document 32).

■ During plaintiff's case, plaintiff had submitted in evidence a stipulation that a 16-year-old girl had a life expectancy of 60 years on May 9, 1962, which was the date of the accident (N.

T. 286). In its case, defendant called a qualified actuary (N. T. 387), who testified at pp. 392–4 as follows:

"BY MR. ARTZ:

"Q Now, Mr. Goodfarb, what is meant by the present value?

"A Present value is a technical term that applies to moneys that is due in the future, and it allows for the fact that when money is due in the future and some compensation is paid today, that there is an allowance for the interest earnings on the money. For example, if I owe somebody a dollar, or a thousand dollars that is due 20 years from now, and if I assume that interest is worth 6 per cent, only $311 today is as good as a thousand dollars due 20 years from now, because if I give somebody today $311.80, he could invest that at 6 percent interest. Over the 20 years he would have the thousand dollars. Therefore, giving him today $311.80 is as good as giving him a thousand dollars 20 years from now.

"Therefore, we say the present value of a thousand dollars at 6 percent interest due 20 years from now is $311.80. That is the present-value concept.

"Q Mr. Goodfarb, assume that a person living on May 9, 1962, would die 60 years from that date, and assume that this person at the time of death had a savings of one dollar. How much money would that person have to

---

9 of his 1954 Article (26 Pa.Bar Assn. Q. 1, at pp. 8–9):
"If they were to be so construed, we would have in Pennsylvania the 'future accumulations' principle, in which event the sum recoverable would be limited to the amount the deceased would probably have accumulated in his estate during the years the jury finds he would have lived. Our Supreme Court has stated, however, that this is not the law in our State."

22. At pages 51–52 of this Article, Mr. Bernstein used this language:
"The Court, in the *Murray* case, did not concern itself with what the decedent, during his lifetime would have done with any sum remaining after the probable

cost of his maintenance had been deducted from his probable earnings. As far as that case was concerned, the decedent could have spent it any way he pleased. He could even have gambled it away, donated all or a portion of it to charity, made gifts to members of his family, or paid for the education of a brother or sister through college. He may have purchased a home with this money, which, at his death, may have been worth more or less than what he paid for it. He may have accumulated sums of money from his earnings and invested them advantageously or poorly. All of these situations would have been deemed immaterial in fixing the measure of damages under the *Murray* case."

get today in order to provide him with the one dollar 60 years from * * * May 9, 1962. * * * At 6 percent interest.

"A With all due respect, you mean 60 years from May 9, 1962?

"Q Yes, sir.

"THE COURT: That is right. That is May 9, 2022.

"THE WITNESS: Yes. That would be between three and four cents; actually, 3.8271 cents.

\* \* \* \* \* \*

In other words, the present value of $10,000. due on May 9, in the year 2002 [2022] is worth today $382.71."

Plaintiff's cross-examination covered solely the effect of using a higher or lower interest rate than 6% in making the above mathematical calculation.[23] Although the plaintiff's counsel was given every opportunity to state his objections to the charge out of the presence of the jury, which was sent out of the courtroom for approximately 20 minutes due to the request of plaintiff's counsel for a recess (N. T. 41 of Document 37), no objection was made to the portion of the charge covering the damages pay-

able under the Survival Act (N. T. 42–54 of Document 37), except that the wage rates for teachers might increase in the future (N. T. 59 of Document 37). However, since the verdict was returned by the jury, plaintiff has raised strenuous objections to this testimony and to the part of the jury charge based on it, apparently on the ground that the mathematical formula used to determine present worth should have taken into account the possibility that the decedent would have saved, and not spent, whatever return, if any, she might have received on her accumulated net earnings from the time she was twenty-one until the time she would have died. These belatedly raised objections to the testimony and to this portion of the charge must be rejected for these reasons, among others:

■ A. Assuming that plaintiff had the right to have the return on the net earnings of the decedent during the years from her majority to the time of her death considered by the jury, this right was waived by failure of the plaintiff to raise this issue or offer evidence concerning it [24] during the trial. As pointed out

23. The objection by plaintiff's counsel to the calling of defendant's admittedly qualified actuary on the ground that his name and address had not been stated in the defendant's pre-trial memorandum must be rejected, due to both waiver and action "to prevent manifest injustice." See F.R.Civ.P. 16. Plaintiff listed among her witnesses in her pre-trial memorandum (page 5 of Document 13) "Actuary," without giving name or address. Defendant specified "the same witnesses as those named in" plaintiff's pre-trial memorandum (Document 14). See paragraph 4 of Standing Order Governing Pre-Trial Procedures (page 7 of Appendix to Local Rules). By stipulating actuarial testimony as part of her case even though no actuary's name or address had been specified by plaintiff (N. T. 286), she waived the right to object to the absence of a naming, with address, of an actuary in defendant's pre-trial memorandum. Furthermore, it has been the custom of counsel in this court not to name actuaries and custodians of hospital records, since it is difficult to de-

termine exactly which actuary or custodian will be available at any particular time in any court room. On this record, there was no error in permitting the qualified actuary to testify. The only other objections of plaintiff to this testimony at the trial (the alleged inadmissibility of present value testimony—N. T. 390—and the use of the 6% interest figure—N. T. 397) were properly overruled. See Brodie v. Philadelphia Transp. Co., 415 Pa. 296, 300 & 302, 203 A.2d 657 (1964).

24. In the *Brodie* case, supra, the court said at 415 Pa. page 302, 203 A.2d page 660:

"\* \* \* enlightenment [on reducing future losses to present worth] \* \* \* can be provided, at least in part, by permitting the use of accepted tables or the testimony of a qualified expert, who can compose the proper computations. A precise, analytical calculation, properly supported by other evidence, will naturally reduce the confusion and greatly enhance the possibil-

above, no mention whatever was made of this point by plaintiff until after the jury returned its verdict.

■ B. As stated above, the Pennsylvania appellate courts have described what sums are recoverable under the Survival Act by the estate which are to be reduced to present worth on a 6% per annum interest basis. See Murray v. Philadelphia Transp. Co., supra, 359 Pa. at p. 74, 58 A.2d 323. These sums consist of earnings less probable cost of his maintenance and no other factors, as Mr. Bernstein has emphasized in his most recent article on this subject quoted above at page 13 (32 Pa.Bar Assn.Q. 47). Such sums are reduced to present worth on the basis of a mathematical computation which is "a mathematical fact" (see Brodie case, supra, 415 Pa. at 302, 203 A.2d 657) and is not based on speculation because the plaintiff will have the opportunity to invest the award the jury has given her. Allowance for any return the decedent would secure on her net earnings assumes she would have invested them, rather than spent them, put them in a non-interest bearing account or in a speculative enterprise which failed. It is just this type of speculation the Pennsylvania appellate courts have stated they wish to avoid by a rule which awards simply net earnings as found by the jury, reduced to present worth on a definite mathematical basis. See Pezzulli case, supra. Perhaps the Pennsylvania appellate courts will adopt as fairer the rule advocated by plaintiff, but where there are such policy uncertainties in state law, diversity cases should be instituted in the state courts so that they can be resolved by the state appellate courts. Where a Federal Court is asked to adopt a new rule affecting state policy under a state statute, the matter should be presented at the pre-trial conference, and at least at the trial, rather than raising the contention after the trial, as has been done in this case.

Failure of the present worth factor to reflect the present value of the loss occasioned to the deceased minor after she became 21, reduced to present worth at 6% simple interest.

A reading of the opinions of the Supreme Court of Pennsylvania in Pezzulli v. D'Ambrosia, supra, 344 Pa. at 647–649, 26 A.2d 659,[25] and Murray v. Philadelphia Transp. Co., supra, 359 Pa. at 72–74, 58 A.2d 323, makes clear that under the Survival Act the jury should determine what the probable earnings of the decedent (after she became 21) would have been, and after deducting the cost of maintaining herself, to allow the

ity of correct and just results. Verdicts based on speculation and emotional reactions will have less cause to occur. Moreover, the amount of future damages warranted by the evidence and the law in a given case is a mathematical fact. There is no logical reason why it should not be established by proof like other relevant facts."

25. In this case, the court said:
"* * * the damages recoverable are measured by the pecuniary loss occasioned to *him*, and therefore to *his estate*, by the negligent act which caused his death. * * *
 * * * * *
"During the interval, however short, which elapses between the occurrence of the accident and the death of the injured person—in the present case ten minutes—there accrues to him a cause of action, because of the injury inflicted upon him, which entitles him to recover, if he has time in which to bring the suit, the present worth of his loss of earning capacity during his life expectancy. It is this cause of action which passes by the act of 1937 to his personal representative. * * * * By providing that executors or administrators may commence and prosecute all personal actions which the decedent might have commenced and prosecuted, the act of 1937 clearly indicates that the actions thus commenced by executors or administrators are the *same* actions which their decedent might have commenced * * *." (pages 647, 648–649, 26 A.2d pages 661–662).

difference (hereinafter called "net earnings") reduced to its present worth. The only variation between the measure of damages in a case such as this and the case where the injured person survives is that the survivor must maintain herself, and, hence, there is no reduction for cost of maintenance if he or she is the plaintiff.

■ Since the actuarial figure offered in evidence (see pp. 14–15 above) reduced to present worth a lump sum of money to be paid to the estate after decedent's life expectancy, it did not give the decedent's representative the present worth of the net earnings she would have received year by year if the accident had not occurred. The plaintiff is entitled to receive a lump sum, which, invested at the simple rate of 6% interest per year, will provide the net earnings she would have received periodically during her life expectancy and, at the end of such expectancy, such sum will be exhausted. See Mr. Bernstein's 1951 Article, supra, at p. 14 (23 Pa.Bar Assn.Q.). The lump sum which would be needed in November 1966, when the decedent would have been 21, to produce $1.00 a year for the 56 years until 2022 at 6% simple interest is approximately $24.16.[25a] and the undersigned has concluded that if any present worth figure was to be submitted to the jury, it should have been such a figure under the above Pennsylvania cases.

In view of the two cases cited above, the undersigned has concluded that a new trial limited to Question 3-B should be granted. See Jamison v. A. M. Byers Company, 330 F.2d 657, 661–662 (3rd Cir. 1964), cert. den. 379 U.S. 839, 85 S.Ct. 74, 13 L.Ed.2d 45 (1964). It is noted that the stated requirement that interest be computed "simply"[26] may have necessitated a factor of .229, rather than .038,[27] even if the approach of

---

**25a.** This figure has been obtained by applying the formula shown in footnote 27 to 56 successive years and adding the results together. This appears to be the approach taken in the cases relied on in the affidavit filed by defendant (Document 50). However, it is noted that the practice in the State Courts has been, apparently, to use figures from tables computed on the basis of compound interest, since no tables are generally available based on simple interest computations. Using the tables available showing interest compounded at the end of each year for 56 years, the figure would be $16.03 (see p. 63 (Tables Section) of "The Mathematics of Investment," by William L. Hart, D. C. Heath & Co., Boston, 1924).

**26.** See Murray v. Philadelphia Transp. Co., supra 359 Pa. at 74, 58 A.2d 323 (fn. 7); Brodie v. Philadelphia Transp. Co., supra 415 Pa. at 300, 203 A.2d at 659, where the court said:

"In Pennsylvania in reducing future damages to their present worth, the interest must be computed simply and at the lawful rate of six per cent only: * * *."

See, also, Kowtko v. Delaware and Hudson Railroad Corp., 131 F.Supp. 95, 106–107 (M.D.Pa.1955). For a use by another Federal District Court of present value tables, see Nollenberger v. United Air Lines, Inc., 216 F.Supp. 734, 738–755 (S.D.Cal.1963).

**27.** The present worth as of February 1966 (the date of the trial) of a dollar to be received in May 2022, assuming simple interest at the rate of 6%, is approximately $ .229. This figure is arrived at by the application of the following formula:

$$T = Prt + P$$

Where T equals the total amount receivable in the year 2022, P equals the principal investment in 1966, r equals the rate of interest (computed annually) expressed as a decimal, and t equals time expressed in years.

Solving for P,

$$P = \frac{T}{rt + 1}$$

Substituting $1.00 for T (the total amount receivable in 2022):

$$P = \frac{\$1.00}{(.06/yr)\ (56\ yr)\ +\ 1}$$

$$P = \frac{\$1.00}{3.36 + 1}$$

$$P = \frac{1}{4.36}$$

$$P = \$\ .229$$

The above formula is a simple derivation of the formulae approved at pp. 1 and 2 of Chap. I of "The Mathematics of

the actuary is acceptable. But cf. Document 50.

Since it is impossible to know what figures were adopted by the jury for the life expectancy, work expectancy, earnings and probable cost of maintenance of the decedent, there is no method of recomputing the answer to this special question in terms of award per year. As explained in the charge (p. 33 of Document 37), the factor of .038 would not have been used by the jury if it determined the life expectancy of the decedent was more or less than 60 years from May 1962.

III. Claim for Loss of Psychic Value of Enjoyment of Life and Portion of Charge on Sympathy and Prejudice (Pars. 5, 17 & 22 of Document 32)

Although plaintiff had not mentioned the item in her Pre-Trial Memorandum (Document 13), at the start of the trial counsel for plaintiff made clear that she was contending she was entitled to recover under the Survival Act "the psychic value of the expectancy and enjoyment of the life of the minor decedent which was cut short by reason of the accident" (see par. 20 of the Complaint) by reference at N. T. 27 to this court's decision in Downie v. United States Lines Co., 231 F.Supp. 192 (E.D.Pa. 1964). Defendant objected to the submission of this item to the jury at all times (N. T. 30 and 106). After con-

siderable discussion of this item (N. T. 105 ff. and 195–201), the trial judge ruled on the morning of the second full day of the trial that this item of damage would not be submitted to the jury when the first group of issues were presented to it for several reasons (N.T. 204-7). This ruling was reaffirmed during the trial (see, for example, denial of par. 5 of plaintiff's Motion for a Directed Verdict (Document 18) at N.T. 437-8 just before counsel commenced their closing arguments.)[28] In spite of this, counsel for plaintiff used this language in his closing argument (N.T. 494 & 495):

" * * * you as human beings can likewise not forget that you are dealing with the departure, the loss of another fellow human being. * * * I feel the loss very deeply, the more deeply because of all that she might have been, all that she promised to be, all that she stood out for and all that she stood for. * * *

* * *

" 'Ask me not for whom the bell tolls—' when they are ringing for someone beloved who is lost—'it tolls for thee,' for each and every one of us.[29]

* * *

"This child was cut down in the bright early morning light of her

---

Investment," by William L. Hart, D. C. Heath & Co., Boston, 1924. A photostatic copy of page 43 of this book, which is attached to this opinion, shows opposite 56 years the factor of .038 used by the actuary.

28. The reasons given at N. T. 204-7, the Pennsylvania decisions limiting the items recoverable under the Survival Act as contained under II above, and the April 1966 decision of Downie v. United States Lines Co., 359 F.2d 344 (3rd Cir. 1966), make clear that these trial rulings do not justify the grant of a new trial and par. 22 of Document 32 must be denied. In the Downie case, supra, at page 347, the court used this language:
 "The rule of these cases appears to be predicated on the theory that the

shortening of one's life expectancy is *per se* a compensable element of damages in an action for personal injury. We believe that the rule is not feasible because of the incalculable variables which may enter into any attempt to place a value on life; absent some workable criteria, a damage award would be base speculation."
Also, the dissenting opinion indicated at p. 349 that State law was to be applied in cases arising under state death acts.

29. With reference to par. 17 of Document 32, there is no objection whatever to reading poems to the jury, provided that the poem does not focus attention on an improper item of damage.

lifetime. It should not have been, but it did."

■ Particularly in view of the above language in plaintiff's closing argument and at least one other inadmissible and prejudicial item brought out by plaintiff during the trial,[30] there is no merit in the objection to the language of the charge emphasizing to the jury that they "were bound by what the trial judge told them the law was, and you are to act accordingly" (objected to at page 1 of plaintiff's Supplemental Brief, filed as Document 47). Also, as pointed out in the April 1, 1966, letter attached to Document 45, irrespective of the above-mentioned parts of the transcript, the charge at pages 2–3 of Document 37, when read consecutively, only "pointed out to the jurors what should properly be brought to the attention of the jurors so that they would review the evidence objectively."

## IV. Alleged Inadequacy of Verdict (Par. 4 of Motion for New Trial)

ᵇ ■ A careful consideration of the record and of the Pennsylvania cases requires the conclusion that the verdict under the Survival Act was not inadequate. In Hankins, Admr. v. Mack, 364 Pa. 417, 421–422, 72 A.2d 268, 270, (1950), the Pennsylvania Supreme Court called attention to the "speculative difficulties always present in arriving at proper compensation in suits for the benefit of deceased minor's estates". As pointed out by the many Pennsylvania cases cited at pp. 10–12 of defendant's brief (Document 45), there are at least eight Pennsylvania appellate court decisions [31] (all decided since 3/1/45) approving verdicts for minors under 18 years of age of less than the amount awarded by the jury under Special Question 3–B in this case.[32] The defendant's Brief also cites the following two cases in this Circuit where verdicts for minors of less than

30. In spite of a ruling at sidebar that present value must be computed on the basis of a 6% per annum interest rate (N. T. 389), which ruling was based on the Pennsylvania rule for over 40 years [see cases cited in footnote 27 above and Schwartz v. United States, 230 F. Supp. 536, 543 (E.D.Pa. 1964)], plaintiff injected into the trial in the jury's presence questions on the effect of a different interest rate, mentioning specifically 3% (N. T. 395–6), so that the trial judge was obligated to make sure by his charge as a whole that the 6% interest rate must be used in computing present value (page 36 of Document 37).

31. Green v. Independent Oil Co., 414 Pa. 477, 201 A.2d 207 (1964)—verdict for $13,093.75 under Survival Statute for a 13-year old boy; Tuttle v. Suznevich, 394 Pa. 614, 149 A.2d 888 (1959)—verdict for $10,000. for a six-year old boy; Milicevich v. Paterline, 388 Pa. 346, 131 A.2d 129 (1957)—verdict for $10,000. under Survival Statute for a six-year old girl; Vereb, Admr. v. Markowitz, 379 Pa. 344, 108 A.2d 774 (1954)—verdict for $5,000. under the Survival Statute for a 10-year old boy; Schultheis v. Levin, 372 Pa. 513, 94 A.2d 740 (1953)—verdict for $10,000, under the Survival Statute for an eight-year old girl; Allen, Admr. v. Silverman, 355 Pa. 471, 50 A.2d 275 (1947)

—verdict for $2,000. under the Survival Statute for a five-year old boy; DiGregorio, Admr. v. Skinner, 351 Pa. 441, 41 A.2d 649 (1945)—verdict for $7500. under the Survival Statute for a 17-year old boy [see, also, DiGregorio, Admr. v. Berg, 359 Pa. 376, 59 A.2d 80 (1948)]; Liguori, Admr. v. City of Philadelphia, 351 Pa. 494, 41 A.2d 563 (1945)—verdict for $12,500. under Survival Statute for a 15-year old boy.

32. In DeSimone v. City of Philadelphia, 380 Pa. 137, 145, 110 A.2d 431 (1955), the court held that $15,000. was not such a grossly excessive Survival Act verdict for a 15-year old girl as to shock its "sense of justice." Cf. Hall v. George, 403 Pa. 563, 170 A.2d 367 (1961), where a $20,-000. Survival Act verdict was held not excessive for an 18-year old high school graduate who was attending teachers' college at the time of his death. In Kantner v. Hynniman, 15 Pa.D. & C.2d 576 (C. P. Mercer Co. 1958), the court approved a Survival Act verdict of $12,500. for a 16-year old high school girl who planned to become a nurse. Several cases from other jurisdictions and from Federal Courts in other Circuits, approving verdicts for minors of less than the amount awarded under Special Question 3–B, are also cited at pages 11 and 12 of defendant's Brief.

the amount awarded by the jury in this case were affirmed by the Federal Courts sitting in Pennsylvania: Borror, Admr. v. Sharon Steel Co., 327 F.2d 165 (3rd Cir. 1964); Reed, Admr. v. Walsh, Civil Action No. 22101 (E.D.Pa. 1959).

In the Article by Montgomery and Marshall, supra, this language is used at pages 295–296:

"Because of the extreme difficulty in proving damages in [cases of deceased minors], juries and the courts have tended to hold down the size of the verdicts."

Some additional objections are covered by comments in Exhibit A.

### EXHIBIT A

### MISCELLANEOUS MATTERS

Paragraphs 7 and 12 of Document 32 are based on the assumption that the jury accepted verbatim the testimony of the witness Stampone (N. T. 232 ff.), which they were not required to do (see, also, p. 57 of Document 37). As to paragraph 6 of Document 32, see testimony of Mr. Loscalzo as to the speed of the car at N. T. 135 ("my top speed was about 50 miles an hour") and 89; * also, the trial judge instructed the jury at least twice that they were to follow their own recollection of the testimony, rather than his memory of it (pp. 6 & 7 of Document 37), and at pp. 54–57 of Document 37 that they should consider all the evidence and that he had not discussed all of it in his charge.

As to paragraph 13 of Document 32, the possible duty of the railroad to supply chocks for a car which the jury had the right to find was attended (see fns. 3 & 4, supra) was covered in the charge at pp. 54–55 of Document 37.

---

* In this connection, plaintiff's counsel, by making an inaccurate statement in his argument to the jury (at N. T. 469, he said: " * * * we have the uncontradicted testimony, the uncontradicted testimony of Julia Stampone, who tells you that that car went across there at approximately 70 miles an hour."), should not be in a position to secure a new trial if the correcting statement of the trial judge (see pp. 43–44 of Document 37) is not as complete as he would like it to be.