494 A.2d 1088

Joseph Edward MARTIN, Appellee

v.

JOHNS–MANVILLE CORPORATION, Pittsburgh Corning Corporation, Owens-Corning Fiberglas Corporation, Eagle-Picher Industries, Inc., Forty-Eight Insulation, Inc., Celotex Corporation, Keene Corporation, Unarco Industries, Inc., Combustion Engineering, Inc. and Raybestos-Manhattan, Inc.

v.

INDUSTRIAL FURNACE SUPPLIES, INC.

v.

OWENS–ILLINOIS, INC.

Appeal of OWENS–CORNING FIBERGLAS CORPORATION, Eagle-Picher Industries, Inc., Forty-Eight Insulation, Inc., Celotex Corporation, Combustion Engineering, Inc. and Owens-Illinois, Inc.

Supreme Court of Pennsylvania.

Argued Sept. 14, 1984.

Decided June 28, 1985.

158

160

Patrick R. Riley, Egler, Anstandig, Garrett & Riley, Pittsburgh, for appellants.

Charles Kirshner, Pittsburgh, for Eagle-Picher Industries, Inc.

James C. Tosh, Beaver, for Forty-eight Insulation, Inc.

Richard G. Lewis and Kathleen S. McAllister, Pittsburgh, for Celotex Corp.

William R. Caroselli, Pittsburgh, for Joseph Edward Martin.

Gerald C. Paris, Pittsburgh, for Pittsburgh Corning Corp.

Before NIX, C.J., and FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

HUTCHINSON, Justice.

Appellants,[1] manufacturers of products containing asbestos, appeal by allowance Superior Court's order reversing an order of the Court of Common Pleas of Allegheny County. Common Pleas had denied a motion for a new trial by appellee, an insulation worker, who claimed he was tortiously injured as a result of exposure to asbestos while installing appellants' products for his own employer. Superior Court remanded to Common Pleas for a new trial limited to damages. 322 Pa.Super. 348, 469 A.2d 655. In so doing, it held the trial judge had erred with respect to damages in two instances, *viz.:* (1) in excluding the testimony of a doctor that there was a "possibility" appellee had suffered from cancer as a result of his exposure; and (2) in determining the evidence of appellants' outrageous conduct was insufficient to submit the issue of punitive damages to the jury.[2]

On this record we reverse Superior Court and, therefore, affirm the Court of Common Pleas of Allegheny County. On the exclusion of appellee's medical evidence Superior Court failed to see a subtle but important distinction be-

1. The trial judge directed a verdict in favor of Raybestos-Manhattan, Inc. and Pittsburgh Corning Corporation. In addition, Superior Court severed defendants Johns-Manville Corporation and Unarco, Inc. from the proceeding before it apparently because those defendants had recently filed petitions for reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 1101 *et seq.* Therefore, these defendants, while listed in the caption, are not parties to this appeal. Keene Corporation has not appealed Superior Court's order awarding the appellee a new trial on damages.

2. Defendant Combustion Engineering had filed a cross-appeal challenging the trial court's refusal to grant its motion for judgment n.o.v. and to strike the verdict the court had directed in favor of Raybestos-Manhattan, Inc. Superior Court affirmed the trial court on these issues and Combustion Engineering has not challenged that ruling on this appeal.

tween evidence sufficiently definite to show present damage and evidence relevant to show a substantial risk of additional future damage. On punitive damages this record does not demonstrate the outrageous conduct necessary to permit a jury to impose them.

This products liability action was initiated by plaintiff-appellee Joseph Edward Martin who filed a complaint in trespass on August 16, 1978 [3] seeking compensatory and punitive damages for asbestosis and related diseases which he claimed he developed as a result of working with products containing asbestos manufactured by defendant-appellants.[4]

The jury returned a verdict in Martin's favor, awarding him $67,000 in compensatory damages. As stated, the trial court had determined that the evidence Martin had presented was insufficient to establish his claim for punitive damages and, accordingly, refused to submit that claim to the jury. It subsequently denied both Martin's initial motion for a new trial and his supplemental motion based on after-discovered evidence. Martin appealed to Superior Court on several grounds. That court reversed and remanded the case to Common Pleas for a new trial limited to damages holding, as stated, that the trial judge erred both in excluding expert testimony offered to establish that Martin's exposure to asbestos significantly increased the risk of his developing lung cancer and in refusing to submit Martin's punitive damages claim to the jury.

In appealing Superior Court's rulings the products manufacturers argue that: (1) the trial judge properly excluded proposed expert testimony regarding the likelihood of Martin's contracting lung cancer; (2) assuming, *arguendo*, that such evidence was improperly excluded, a new trial should

3. Martin died on August 1, 1982.

4. Martin's theories of recovery included strict liability under the Restatement (Second) of Torts § 402A, negligence, gross negligence and willful and wanton misconduct for the manufacturers' failure to warn insulation applicators of the potential health hazards associated with products containing asbestos. Only the 402A theory went to the jury.

not be limited to compensatory damages issues but should include relitigation of the liability issues; (3) punitive damages should be unavailable to plaintiffs who seek compensation for injuries allegedly attributable to exposure to products containing asbestos on a "strict" liability theory based on Restatement 402A principles; and (4) in any case, the trial judge correctly ruled Martin failed to present sufficient evidence to support his punitive damages claim. In addition, Celotex Corporation contends that this Court may not consider information contained in appellee's brief which was not presented either at trial or to Superior Court, on the issue of whether Celotex may be liable for any punitive damages imposed because of the conduct of its predecessor, the Philip Carey Manufacturing Company.

■ At the outset we are mindful of the circumscribed scope of appellate review applicable to a trial court's order granting or denying a new trial. As we have frequently stated, the grant or denial of a new trial will not be reversed on appeal absent either an error of law which controlled the outcome of the case, *Anzelone v. Jesperson*, 436 Pa. 28, 30, 258 A.2d 510, 510 (1969); *Allison v. Snelling & Snelling, Inc.*, 425 Pa. 519, 521, 229 A.2d 861, 862 (1967), or a palpable abuse of discretion where the ruling turns on the weight of the evidence, *Lobozzo v. Adam Eidemiller, Inc.*, 437 Pa. 360, 367–68, 263 A.2d 432, 436 (1970). The issues presented here must be considered within that narrow scope of review.

Appellants first challenge Superior Court's determination that the trial judge improperly granted appellants' motion *in limine* to exclude any references to cancer. In response to the motion *in limine* appellee offered the proposed testimony and written report of Dr. Murray Sachs. The report, which had previously been furnished to the appellants, sets forth Dr. Sachs's diagnosis following his examination of appellee in 1978. The doctor concluded that appellee suffered from "chronic obstructive lung disease with asbestosis." He added that he could not exclude the possibility of bronchogenic carcinoma (lung cancer) particu-

larly in light of appellee's recent hempotysis (blood-spitting episode) and that appellee should be studied for this possibility. *See* Reproduced Record (hereafter "R.R.") at 11a–12a.

In response to questioning by the trial judge, appellee's attorney stated that:

I believe it will be Dr. Sachs's testimony that based on the exposure that [appellee] has had, based on the symptomatology [hemoptysis] that [appellee] has, that there may, in effect, be cancer which exists now, which is not detectable but he is most certainly at risk.

R.R. at 36a.

In sustaining appellants' motion, the trial court concluded that the above offer of proof was inadequate to establish appellee's claim that he risked developing bronchogenic carcinoma as a result of his exposure to asbestos. The court explained that appellee should have been prepared to offer evidence confirming the risk of cancer associated with asbestos exposure by statistical or epidemiological analyses of that risk. Common Pleas slip op. at 5, 8.

 It is well-settled that a plaintiff in a personal injury action may introduce expert testimony to support a claim that he may suffer certain future harm as a result of a past injury. *Boyle v. Pennsylvania Railroad Company*, 403 Pa. 614, 618, 170 A.2d 865, 867 (1961); *Walsh v. Brody*, 220 Pa.Superior Ct. 293, 296, 286 A.2d 666, 668 (1971); *Schwegel v. Goldberg*, 209 Pa.Superior Ct. 280, 287, 228 A.2d 405, 409 (1967). It is likewise true that where the issue in question is one of prognosis, "a doctor cannot be required to express his opinion with the definiteness required in a causation question." *Boyle v. Pennsylvania Railroad Company*, 403 Pa. at 618, 170 A.2d at 867. *See also Stevenson v. Pennsylvania Sports & Enterprises, Inc.*, 372 Pa. 157, 165, 93 A.2d 236, 240 (1952).

 Dr. Sachs's proposed testimony, based on appellee's history of exposure to asbestos together with his one blood-spitting episode, that appellee may have had cancer at

the time he examined him, is not probative of the fact for which appellee now says it was offered, *i.e.,* that appellee faced a substantially increased risk of contracting cancer as a result of his exposure to asbestos.[5] Accordingly, Dr. Sachs's proposed testimony and the information contained in his report are not relevant to their offered purpose,[6] and the trial court did not abuse its discretion in excluding both.[7]

Appellants next challenge Superior Court's rulings that plaintiffs may seek punitive damages in products liability actions predicated solely on a strict liability theory and that, in this particular case, the evidence was sufficient to warrant submission of appellee's punitive damages claim to the jury. Our Court has never decided the question of whether punitive damages are available in an action grounded in

5. Even if Dr. Sachs's report and in-court testimony could be considered as offered and relevant to prove that appellee "is most certainly at risk," their factual predicate is not given and so is speculative even under the less exacting standards for future probabilities. The possibility of future harm caused by a tortious act is not admissible in evidence. *Lorch v. Eglin,* 369 Pa. 314, 320, 85 A.2d 841, 843–44 (1952). A jury may not award damages on the basis of speculation or conjecture. *Id.; Rice v. Hill,* 315 Pa. 166, 173, 172 A. 289, 291–92 (1934). Instead, the plaintiff must present competent evidence from which the jury can reasonably determine the degree to which future consequences of a present injury are probable and, accordingly, what the amount of any damages award should be. *Rice v. Hill, supra; Baccare v. Mennella,* 246 Pa.Superior Ct. 53, 55, 369 A.2d 806, 807 (1976). *Compare Boyle v. Pennsylvania Railroad Co.,* 403 Pa. at 618, 170 A.2d at 867; *Schwegel v. Goldberg,* 209 Pa.Superior Ct. at 286–87, 228 A.2d at 408–09.

6. This medical evidence is relevant to the issue of whether cancer existed, but incompetent for that purpose. Dr. Sachs spoke on that issue in terms of a possibility; he did not express an opinion he held with reasonable professional certainty. *See Jones v. Montefiore Hospital,* 494 Pa. 410, 417, 431 A.2d 920, 924 (1981) ("medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct *increased the risk* of harm actually sustained") (emphasis in original); *Gradel v. Inouye,* 491 Pa. 534, 545, 421 A.2d 674, 679 (1980); *Hamil v. Bashline,* 481 Pa. 256, 267–68, 392 A.2d 1280, 1285–86 (1978).

7. Given our holdings we do not reach appellants' next argument, namely, that if we order a new trial, they should be permitted to relitigate the liability issues as well as the compensatory damages claims.

strict liability for injuries allegedly caused by a defective product. However, the quality of evidence here presented makes it unnecessary and inappropriate for us to consider either the broad policy arguments or the legal theory the parties present supporting a blanket rule for or against the allowance of punitive damages in litigation involving mass-marketed products.[8]

Martin worked as an industrial and commercial applicator of "asbestos-containing" thermal insulation materials manufactured by the defendants from 1939 until January, 1978. He never worked for an asbestos manufacturer. He bases his claim for punitive damages on the fact that none of the defendant-appellants placed warnings on their products concerning any risk of pulmonary ailments associated with asbestos exposure before 1964 even though, he claims, the medical profession knew that inhalation of asbestos caused asbestosis as early as the 1930's.

In arguing the propriety of punitive damages appellee relies principally on the testimony of two witnesses, Jerome F. Wiot, M.D., a physician specializing in radiology, and Thomas F. Mancuso, M.D., a physician and expert in occupational health.

The bulk of Dr. Wiot's testimony pertained to his evaluation of appellee's medical condition based on x-rays. Dr. Wiot testified that, generally, fibrotic changes in the lungs

---

**8.** Appellants claim that punitive damages, which are imposed on account of the defendant's outrageous conduct, are incompatible with a products action premised only on strict liability in which the liability focus is on the condition of the defendant's product and "fault" is irrelevant. *See, e.g., Sturm, Ruger & Co. v. Day*, 594 P.2d 38, 45 (Alaska 1979), *modified on reh.*, 615 P.2d 621 (1980), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981).

In addition, appellants advance various policy reasons in support of their position that punitive damages are inappropriate in the context of mass-marketed products liability litigation. *See, e.g., Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2d Cir.1967); Surrick, *Punitive Damages and Asbestos Litigation in Pennsylvania: Punishment or Annihilation?*, 87 Dick.L.Rev. 265 (1983). Appellee counters with policy arguments which support the contrary view. *See, e.g., Fischer v. Johns-Manville Corp.*, 193 N.J.Super. 113, 127–129, 472 A.2d 577, 586 (1984); Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich.L.Rev. 1257 (1976).

due to inhalation of asbestos fibers were first discussed in medical literature in the 1930's and that pleural manifestations were covered in the journals beginning in the 1940's. R.R. at 225a.

Dr. Wiot further testified that he read a 1946 article authored by Walter Fleischer and others which reported the results of an epidemiological survey of workers who installed pipe-covering containing asbestos on ships and which concluded that pipe-covering is not a dangerous occupation. R.R. at 281a. Dr. Wiot also stated that he attended a talk given by Dr. Irving Selikoff in 1964 in which Selikoff discussed his then-recent study of insulation workers which found that they, in fact, face health risks from asbestos exposure. Dr. Wiot recalled that Dr. Selikoff termed his study the first "definitive" one of its kind, which Dr. Wiot interpreted to mean the first important study of insulation workers. R.R. at 282a–284a.

Finally, Dr. Wiot testified that he did not know if the subject of warnings, in connection with insulation products, appeared in any literature before 1964, R.R. at 284a, or what knowledge the asbestos industry had, generally, at any time, regarding the impact of asbestos exposure on health. R.R. at 290a.

Dr. Mancuso, on whose testimony appellee relies most heavily, stated that he served as a consultant to Philip Carey Manufacturing Company, predecessor of Celotex, from October, 1962 to October, 1963 to help the Company develop a company-wide plant health program. *See* R.R. at 63a, 67a–68a, 78a.[9] Dr. Mancuso testified that, during the twelve months he was a consultant, he continued to provide the Company with information pertaining to the hazards associated with asbestos exposure in the form of oral and written reports and scientific literature covering that subject, including Dr. Selikoff's article relating to insulation workers. R.R. at 78a–79a, 106a, 115a.

9. Dr. Mancuso never rendered consulting services for, or was otherwise employed by, any of the other corporate appellants.

Dr. Mancuso testified that in October, 1963 officials of Philip Carey advised him of cases of asbestosis among employees, R.R. at 86a, and that he subsequently learned that between 1957 and 1962 the death of four employees was asbestos-related. R.R. at 97a. He further testified that in a letter to Philip Carey officials dated May 23, 1963, he recommended that the Company (1) establish a nation-wide industry research program focusing on the hazards associated with asbestos, R.R. at 102a; (2) issue a practice manual outlining safe handling procedures to be developed on the basis of analyses of consumer uses, R.R. at 103a; and (3) develop control measures for all new manufacturing processes and consumer product uses. R.R. at 104a. *See also* 110a–113a.

Dr. Mancuso testified that in a report dated September 23, 1963 he specifically advised Philip Carey executives that health risks are present wherever asbestos exists and that asbestos workers, including pipe-fitters and boilermakers, too, were at risk. R.R. at 116a. In addition, Dr. Mancuso stated that he emphasized to Philip Carey personnel that insulation workers have minimal exposure to asbestos but nonetheless face risks. R.R. at 150a. He said that he had no personal knowledge of what information Philip Carey ever sent to purchasers or whether the Company took measures to eliminate asbestos from their products after he stopped serving as their consultant. R.R. at 155a.

Dr. Mancuso testified that he is familiar with the 1946 Fleischer Report but that he disagrees with its conclusions. R.R. at 158a–159a. Moreover, he conceded that no reports indicating that insulation workers risk developing asbestosis were available until 1962 or 1963. R.R. at 162a. Nevertheless, he contended that such risks had been established long before then by clinical epidemiolgoical observations made by physicians of insulation workers who had developed asbestosis. R.R. at 169a. Finally, Dr. Mancuso testified that at no time during the period he served on the Labelling Committee of the ACGIH [10] did the Committee

10. American Conference of Governmental Industrial Hygienists.

make any recommendations concerning the labelling of asbestos products. R.R. at 188a.

Appellee also called Jane Brislin, Director of Informational Services of the Industrial Health Foundation, who testified regarding abstracts of medical articles which are routinely disseminated by the Foundation to member companies. In summary, Brislin's testimony established that several appellants were, or had been, members of the Foundation, R.R. at 573a–576a, 594a–595a, and, during periods of membership, had access to, and received, information concerning various health risks associated with asbestos exposure.

In Pennsylvania, the function of punitive damages is to deter, *see Thompson v. Swank,* 317 Pa. 158, 159, 176 A. 211, 211 (1934), and punish, *see Voltz v. General Motors Acceptance Corp.,* 332 Pa. 141, 145, 2 A.2d 697, 698 (1938), egregious behavior. *See Cochetti v. Desmond,* 572 F.2d 102, 105 (3d Cir.1978) (applying Pennsylvania law); *Esmond v. Liscio,* 209 Pa.Superior Ct. 200, 212, 224 A.2d 793, 799 (1966); Restatement (Second) of Torts § 908(1) (1979). Consistent with that theory, we preclude insurance against them. *Reimer v. Delisio,* 501 Pa. 662, 666, 462 A.2d 1308, 1310 (1983) (concurring and dissenting opinion by Hutchinson, J.); *Edmond v. Liscio,* 209 Pa.Superior Ct. at 212, 224 A.2d at 799. Punitive damages are appropriate to punish and deter only extreme behavior and, even in the rare instances in which they are justified, are subject to strict judicial controls. *See* discussion, *infra* at 170–175.

As a general guide in this area Pennsylvania recognizes the principles set forth in Section 908(2) of the Restatement of Torts (Second):

> (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant

caused or intended to cause and the wealth of the defendant.

*See Chambers v. Montgomery,* 411 Pa. 339, 344, 192 A.2d 355, 358 (1963). Thus, in deciding whether punitive damages should be assessed, the nature of the tortfeasor's act itself, together with his motive, the relationship between the parties and all other attendant circumstances should be taken into account. *Feld v. Merriam,* 506 Pa. 383, 396, 485 A.2d 742, 748 (1984); *Chambers v. Montgomery,* 411 Pa. at 345, 192 A.2d at 358; Restatement of Torts (Second) § 908, comment *e.* Under these principles, the imposition of damages to punish a civil defendant is appropriate only where the conduct complained of is especially egregious. *See id.* at § 908, comment *b.* Punitive damages may not be awarded for misconduct which constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Id.*

■■ Comment *b* following Section 908 further states that "[r]eckless indifference to the rights of others and conscious action in deliberate disregard of them (see § 500)[11] may provide the necessary state of mind to justify punitive damages." However, our courts have not construed this statement as authority for the proposition that "reckless indifference to the rights of others," which provides a basis for an award of punitive damages, is equivalent to both distinct types of wanton or willful misconduct included in the Section 500 definition of those terms. In fact, "[w]anton misconduct as defined in § 500 of the Restatement of Torts 2d and in *Evans v. Philadelphia Transportation Co.,* 418 Pa. 567, 212 A.2d 440 (1965), is not the same as the 'outrageous conduct ... done with a reckless indifference to

11. Section 500 of the Restatement defines "reckless disregard of safety" and reads as follows:

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.
Restatement (Second) of Torts § 500 (1965).

the interests of others....' " *McSparran v. Pennsylvania Railroad Company*, 258 F.Supp. 130, 134 (E.D.Pa.1966) (applying Pennsylvania law) (citations omitted), *quoted in Focht v. Rabada*, 217 Pa.Superior Ct. 35, 39–40, 268 A.2d 157, 160 (1970).

Comment *a* to Section 500 describes two distinct types of reckless conduct which represent very different mental states: (1) where the "actor knows, or has reason to know, ... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk;" and (2) where the "actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so." The first type of reckless conduct described in Section 500 demonstrates a higher degree of culpability than the second on the continuum of mental states which range from specific intent to ordinary negligence. An "indifference" to a known risk under Section 500 is closer to an intentional act than the failure to appreciate the degree of risk from a known danger. This distinction is particularly important in determining what facts justify punitive damages in cases where, as here, liability is based on failure to warn against the risk of a disease with a long latency period arising out of exposure to a useful but unavoidably dangerous product.

Under Pennsylvania law, only the first type of reckless conduct described in comment *a* to Section 500, is sufficient to create a jury question on the issue of punitive damages.[12] Thus, "punitive damages are awarded only for

12. The only purpose of punitive damages is to deter outrageous conduct. It is impossible to deter a person from taking risky action if he is not conscious of the risk. Thus, in *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984), we addressed the issue of when punitive damages are warranted and stressed that, in determining whether certain conduct is outrageous, "[t]he state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." Similarly, the Restatement explains that "reckless indifference to the rights of others and conscious action in *deliberate* disregard of them ... may provide the necessary state of mind to justify punitive

outrageous conduct, that is, for acts done with a bad motive or with a *reckless indifference* to the interests of others." *Chambers v. Montgomery*, 411 Pa. 339, 344, 192 A.2d 355, 358 (1963) (quoting comment *b* to Section 908[1] of the Restatement of Torts) (emphasis added). *See Feld v. Merriam*, 506 Pa. at 395, 485 A.2d at 747. Comment *b* to Section 500, read in light of preceding comment *a* to that section, indicates that Section 908 damages are not justified where the defendant's mental state rises to no more than gross negligence. *Accord Thomas v. American Cystoscope Makers, Inc.*, 414 F.Supp. 255, 267 (E.D.Pa.1976) (applying Pennsylvania law in a products liability action).[13]

damages." Comment *b* (emphasis added). Therefore, an appreciation of the risk is a necessary element of the mental state required for the imposition of such damages.

Of course, the factfinder may consider the seriousness of any potential harm in evaluating the evidence on the extent of the actor's comprehension of potential injurious consequences. The more serious the possible harm, the more the actor is likely to perceive the risk of that harm.

13. In that action by a physician against the manufacturer of a surgical instrument for damages from an electrical burn of his cornea allegedly caused by the instrument's defective design, the court, after reviewing the evidence, observed:

Here, ACMI did little to fulfill its responsibility as a manufacturer for the safety of its products. It failed to take the quite reasonable steps which it might have under the circumstances to have avoided the clearly foreseeable risk of harm. But the fact that the danger should have been foreseen does not mean, contrary to plaintiff's assertion, that the risk was fully realized, or at least, realized to the extent necessary to show that degree of knowledge which when consciously disregarded deserves the opprobation of "recklessness." In short, the most that can be said from the evidence is that, measured by an objective standard of care, this defendant should have done more. We simply cannot say that the evidence was sufficient to demonstrate that subjective kind of awareness that is the distinguishing element of reckless conduct.

. . . . .

It is quite clear, we think, from the evidence, that the jury could well have found negligence or even gross negligence on the part of this defendant. But negligent conduct, no matter how gross or wanton, cannot be equated with the conduct required for punitive damages. We hold, therefore, that plaintiff's evidence in this case was insufficient as a matter of law to demonstrate that type of "outrageous conduct" on which an award of punitive damages must depend.

*See also Campus Sweater & Sportswear v. M.B. Kahn Constr. Co.,* 515 F.Supp. 64, 104 (D.S.C.1979), *affirmed,* 644 F.2d 877 (4th Cir.1981) ("South Carolina, as do most other jurisdictions, requires misconduct above and beyond mere negligence or gross negligence").

■■■ The imposition of punitive damages is also subject to additional, more general, restrictions. First, the trial judge must determine whether the plaintiff has presented sufficient evidence to support a punitive damages claim, *i.e.,* facts from which the jury might reasonably conclude that the preponderance of the evidence establishes outrageous conduct by the defendant.[14] *See, generally, Smith v. Bell Telephone Co.,* 397 Pa. 134, 138–39, 153 A.2d 477, 480 (1959); *Thomas v. American Cystoscope Makers, Inc.,* 414 F.Supp. at 261.

■■■ Second, in order to recover punitive damages the plaintiff must first prove actual compensatory damages, *Hilbert v. Roth,* 395 Pa. 270, 276, 149 A.2d 648, 652 (1959), *Bruce Lincoln-Mercury, Inc. v. Universal C.I.T. Credit Corp.,* 325 F.2d 2, 22 (3d Cir.1963) (applying Pennsylvania law). Any punitive damages which are awarded must then bear a reasonable relationship to those actual compensatory damages. *Hughes v. Babcock,* 349 Pa. 475, 481, 37 A.2d 551, 554 (1944); *Neal v. Carey Canadian Mines, Ltd.,* 548

414 F.Supp. at 266–267 (footnote omitted).

**14.** In an effort to control punitive damages awards in products liability actions, several courts and commentators would require the plaintiff to establish his products liability claim by "clear and convincing evidence." *See, e.g., Martin v. Johns-Manville Corp.,* 322 Pa.Superior Ct. 348, 380, 469 A.2d 655, 671 (1983) (concurring and dissenting opinion by Judge Wieand); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 300–302, 294 N.W.2d 437, 458 (1980); Comment, *The Imposition of Punitive Damages in Products Liability Actions in Pennsylvania,* 57 Temple L.Q. at 230. *But see Thomas v. American Cystoscope Makers, Inc.,* 414 F.Supp. at 265. We believe the goal of limiting punitive damage awards in the context of products liability litigation is best served by focusing on the nature of the defendant's conduct instead of increasing the plaintiff's burden of persuasion. Under Pennsylvania law, the imposition of punitive damages is an extreme remedy which is appropriate to deter and punish only reckless indifference to the plaintiff's safety.

F.Supp. 357, 377 (E.D.Pa.1982) (applying Pennsylvania law). This requirement serves an important purpose in litigation involving mass-marketed products. Specifically, it prevents multiple recovery at the defendant-seller's expense by insuring that the plaintiff collects only his proportion of the punitive damages which the defendant owes all purchasers and consumers of its products. *Accord Sturm, Ruger & Co. v. Day*, 594 P.2d 38, 48 (Alaska 1979), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981) (vacating a punitive damages award and holding that where plaintiff was awarded $137,750 in compensatory damages, any punitive damages assessed following a new trial were not to exceed $250,000), *modified on reh'g.*, 615 P.2d 621 (Alaska 1980) (original punitive damages award of $2,895,000 reduced to $500,000 instead of $250,000); *Hoffman v. Sterling Drug, Inc.*, 374 F.Supp. 850, 856–57 (M.D.Pa.1974), *on remand from* 485 F.2d 132 (3d Cir.1973) (applying Pennsylvania law); *Toole v. Richardson-Merrell, Inc.*, 251 Cal. App.2d 689, 60 Cal.Rptr. 398 (1st Dist.1967) (reducing award).

Appellee contends that, under Pennsylvania law, the evidence he presented at trial is sufficient to support his punitive damages claim and directs our attention to two federal diversity cases in which Pennsylvania law was applied. Appellee first refers to *Neal v. Carey Canadian Mines, Inc.*, 548 F.Supp. 357 (E.D.Pa.1982), and maintains simply that, there, the district court upheld the jury's punitive damages award on the basis of the testimony of Dr. Mancuso who testified at the trial in that case. *Neal* and the case before us are factually dissimilar. In *Neal*, twenty-four former employees of Philip Carey's manufacturing plant at Plymouth Meeting, Pennsylvania, sued the Company claiming that they had developed asbestosis and related diseases as a result of inhaling asbestos fibers used in the manufacture of the material at that plant. The district court ruled that the punitive damages award was justified because the plaintiff proved that Philip Carey took no action in response to Dr. Mancuso's recommendation in September, 1963 that the Company advise its employees of the risk

of their contracting an asbestos-related condition. *Id.* at 381.

The appellee in the instant case was involved in the *application*, not the *manufacture*, of asbestos-containing insulation material and was never employed by any of the appellant corporations. In the case before us, Dr. Mancuso's testimony addressed the issue of the extent to which, and when, Philip Carey (now Celotex) and, presumably, the other appellants, knew of the health risks independently employed *installers* face as a result of asbestos exposure.[15] Appellee cannot cite *Neal* for the proposition that Dr. Mancuso's testimony here justifies punitive damages because the two cases are distinguishable on the facts.

For the same reason we cannot agree with the appellee that *Hoffman v. Sterling Drug, Inc.,* 485 F.2d 132 (3d

15. In fact, Dr. Mancuso testified that Dr. Selikoff's epidemiological studies recorded in 1964 were the first live scale studies which focused specifically on insulation workers. R.R. at 169a. *See also* R.R. at 155a. In addition, he agreed that, in general, insulation workers experience minimal exposure to asbestos as compared with workers in asbestos manufacturing plants. R.R. at 157a. At trial, the following excerpt from a book co-authored by Drs. Selikoff and Douglas H.K. Lee was read to the jury:

> The early 1960's is a convenient time at which to terminate a historical review of asbestos disease and proceed to elaborate present concepts. With the admirable hindsight of 15 years we can see that the essential evidence has already been reported, but not yet in a fashion to be universally convincing.
>
> That parenchymal asbestosis was very likely to occur in those who had been exposed to heavy dosage in the early years of the industry was clear enough, but what effects environmental controls proposed in the 1930's would have upon its future incidence was not known. The possibility that quite low dosages might have grave consequences 30 years after initial exposure was still tenuous. Many things were needed to conform the suggestions that were emerging from the studies then available; most importantly, systematic epidemiological investigation of large cohorts drawn from various types of industries, and comparison with adequate control populations. Some of these were already organized, but it was too early for the results to be adequately interpreted.

I. Selikoff and D. Lee, *Asbestos and Disease* (1978), *quoted at* R.R. 167a–68a. The evidence presented in this case shows that before the 1960's, the medical profession knew considerably more about the risks workers in asbestos products manufacturing plants face than about those confronting installers of asbestos-containing materials.

Cir.1973), supports his sufficiency claim. There, the plaintiff sought compensatory and punitive damages for injury to his retina and an accompanying vision impairment which he claimed he sustained as a result of ingesting defendant's drug, chloroquine phosphate, marketed under the trade name "Aralen." The *Hoffman* plaintiff charged that the defendant-manufacturers either willfully, recklessly, or both, failed to advise the United States Food and Drug Administration (FDA) and the medical profession of the danger of chloroquine retinopathy associated with Aralen when they were aware of it and even issued literature and other information to doctors and potential users which misrepresented and grossly understated their knowledge of the dangers of the drug. *Id.* at 144–45. There the plaintiff introduced evidence which included reports and letters by physicians directly to the defendants as well as substantial uncontroverted medical literature. These documents established that the defendants knew conclusively by at least 1962 that chloroquine caused adverse retinal changes. The *Hoffman* plaintiff also offered evidence which established that defendants initially marketed Aralen without prior FDA approval. On appeal the court determined the jury should have been allowed to consider whether defendants' product literature misrepresented and understated their knowledge of the dangers associated with Aralen and, if so, whether that conduct constitutes reckless indifference to the public's safety. *Id.* at 146.

■ On this appeal Martin has not argued that the appellants appreciated the risks of asbestosis insulation installers face and, nevertheless, acted or failed to act in flagrant disregard of their safety. Moreover, even if appellee had made such an allegation, the evidence he presented at trial through Dr. Mancuso was insufficient to support it. Instead, appellee states that appellants had access to certain literature which discusses generally the risks in question and are subject to punitive damages because they, nevertheless, failed to provide adequate warning labels on their products. He further contends that:

> Where the potential hazard attendant to a product is so severe and the consumer could have been given the opportunity to guard against a disabling exposure to the product by the manufacturer including a simple, adequate warning of the acknowledged danger on the product, it should be for the jury to resolve the social equasion [sic] of whether such inactivity in view of the medical state of the art constitutes such outrageous conduct to justify the imposition of exemplary damages.

Brief for Appellee at 26.

The conduct described by the appellee might establish the liability of some or all of the defendants for negligence. It does not demonstrate the culpable mental state necessary, under existing Pennsylvania law, to prove the recklessly indifferent conduct which would permit a jury to award punitive damages.[16]

Finally, we note that in his appeal to Superior Court Martin argued that the trial judge erred in instructing the jury that it could apportion any compensatory damages according to the percentage of harm caused by Martin's asbestos exposure and that which resulted from his cigarette smoking and then reduce the total sum of compensatory damages by the amount attributable to smoking. Because of its disposition of the other issues raised by Martin, Superior Court did not consider whether that jury instruction was, in fact, proper. Given the posture of the case on this appeal, the issue was not fully briefed or argued before our Court. Consequently, we must remand to Superior Court for its determination as to whether the trial court properly instructed the jury that it could reduce any damages award to reflect that portion of Martin's medical condition caused by his cigarette smoking.

16. Given our holding we do not reach the claim asserted by Celotex, *see, supra* at 162–164; nor do we express any view with regard to Superior Court's treatment of the issue of the circumstances under which a successor corporation may be held liable in punitive damages for outrageous acts of its predecessor.

The order of Superior Court is vacated and the case remanded to it for further proceedings consistent with this opinion.

McDERMOTT, J., files a concurring opinion, in which PAPADAKOS, J., joins.

NIX, C.J., and ZAPPALA, J., concur in the result.

LARSEN, J., did not participate in the consideration or decision of this case.

McDERMOTT, Justice, concurring.

In his Opinion Announcing the Judgment of the Court, Mr. Justice Hutchinson correctly notes that:

> "the quality of evidence here presented makes it unnecessary and inappropriate for us to consider either the broad policy arguments or the legal theory the parties present supporting a blanket rule for or against the allowance of punitive damages in litigation involving mass-marketed products."

At 164–168. In light of this fact it is wholly unnecessary to plunge headlong into a dissertation on the various nuances of punitive damages in Pennsylvania. However, since the issue has been raised I must take issue with the implication that wanton misconduct may not be sufficient grounds upon which to assess punitive damages.

The concept of wanton misconduct was defined by this Court in *Evans v. Philadelphia Trans. Co.*, 418 Pa. 567, 212 A.2d 440 (1965):

> [It] means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

*Id.*, 418 Pa. at 574, 212 A.2d at 443.

Thereafter, in *Fugagli v. Camasi*, 426 Pa. 1, 229 A.2d 735 (1967) the Court wrote:

[It] is not necessary for the tortfeasor to have actual knowledge of the other person's peril to constitute wanton misconduct. *Such exists if he has knowledge of sufficient facts to cause a reasonable man to realize the existing danger for a sufficient period of time beforehand to give him a reasonable opportunity to take means to avoid the danger and, despite this knowledge, he recklessly ignores the other person's peril.* (Citation omitted.)

*Id.*, 426 Pa. at 3, 229 A.2d at 736.

In *Focht v. Rabada,* 217 Pa.Super. 35, 268 A.2d 157 (1970) the Superior Court relied upon these principles to approve the imposition of punitive damages against a defendant who was found liable for driving while under the influence of intoxicating liquor. That court noted that "[in] certain factual circumstances the risk to others ... may be so obvious and the possibility that harm will follow so great that outrageous misconduct may be established without reference to motive or intent." *Id.,* 217 Pa.Superior Ct. at 41, 268 A.2d at 161.

Now however, Mr. Justice Hutchinson, joined by Mr. Justice Flaherty, seems to decide, in a vacuum no less, that punitive damages are inappropriate "where the actor has such knowledge, or reason to know of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man would do so." at 170–171.

In light of accepted definition of wanton misconduct *Fugagli, supra, Evans, supra,* such a decision contradicts what we said in *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984), to wit: "[p]unitive damages must be based on conduct which is 'malicious' *'wanton'* 'reckless' 'willful' or 'oppressive'...." *Id.,* 506 Pa. at 383, 485 A.2d at 742 (emphasis added). *See Hughes v. Babcock,* 349 Pa. 475, 37 A.2d 551 (1944).

Therefore, I concur in the result only.

PAPADAKOS, J., joins in this concurring opinion.