SHARED COMMUNICATIONS SER-
VICES OF 1800–80 JFK BOU-
LEVARD INC., Appellee,

v.

BELL ATLANTIC PROPERTIES INC.,
Metropolitan Life Insurance Co., 1800
JFK Joint Venture, Bell of Pennsylva-
nia, Bell Atlantic Corporation, 1880 JFK
Joint Venture, and Eastern Telelogic
Corp.

Appeal of BELL ATLANTIC PROPER-
TIES INC., Bell Atlantic Corporation,
Bell of Pennsylvania, Metropolitan Life
Insurance Co., 1800 JFK Venture, and
1880 JFK Joint Venture, Appellants.

SHARED COMMUNICATIONS SER-
VICES OF 1800–80 JFK BOULE-
VARD INC., Appellant,

v.

BELL ATLANTIC PROPERTIES INC.,
Metropolitan Life Insurance Co., 1800
JFK Joint Venture, JFK Operating
Corp. and Eastern Telelogic Corp., Ap-
pellees.

Superior Court of Pennsylvania.

Argued Nov. 14, 1996.
Filed Feb. 28, 1997.
Reargument Denied May 9, 1997.

Carl A. Solano Philadelphia, for Bell Atlantic Properties, etc.

William H. Lamb, West Chester, and Donald N. David, New York City, pro hac vice, for Shared Communications.

Before CIRILLO, President Judge Emeritus, and DEL SOLE and OLSZEWSKI, JJ.

OLSZEWSKI, Judge.

Shared Communications Services of 1800–80 JFK Boulevard, Inc. (SCS) commenced the instant action against Bell Atlantic Properties, Inc. (BAP), Metropolitan Life Insurance Company (MET LIFE), 1800 JFK Joint Venture, 1880 JFK Joint Venture, Bell Atlantic–Pennsylvania (Bell PA), Bell Atlantic Corporation (BAC), and Eastern Telelogic Corp. in 1990.[1] SCS sought damages against the defendants for, *inter alia*, breach of contract, and tortious interference with contractual relations. SCS alleged that BAP and MET LIFE breached an agreement dated September 9, 1986, whereby SCS would provide shared tenant services to tenants of a building in Center City Philadelphia. SCS also alleged that BAP's corporate parent, BAC, in concert with another BAC subsidiary, Bell PA, tortiously interfered with the September 9th agreement. Following a five-week trial, a jury found in favor of SCS and awarded significant damages, both compensatory and punitive. The jury also returned a verdict in favor of 1800 JFK Joint Venture on its counterclaim against SCS for past due rent.

Following consideration of post-trial motions, the trial court refused to grant the defendants a new trial or a judgment notwithstanding the verdict. The court did, however, grant 1800 JFK Joint Venture's request that its verdict against SCS be molded so as to include interest. From these determinations, embodied in an order and opinion dated March 1, 1996, the defendants

filed an appeal docketed at 1264 Philadelphia 1996,[2] and SCS filed a cross-appeal docketed at 01413 Philadelphia 1996.

■ Bell PA and BAC first assert that the civil conspiracy claim entered against them should be reversed because SCS never pled such a claim in the original complaint. In the original complaint, SCS pled, in Count V, that "BAC and [Bell PA] induced the parties to the Agreement (other than plaintiff) to breach the Agreement." Complaint at ¶ 59; R.R. at 27a. While this language was included in the context of what was essentially an antitrust claim, it did plead the material facts upon which the conspiracy to tortiously interfere claim was ultimately based. *See* Pa. R.C.P. 1019(a) (requiring a plaintiff to plead material facts upon which a cause of action is based). Accordingly, the trial court did not err in finding sufficient elements in the original complaint to make out a *prima facie* case of civil conspiracy, and in permitting SCS to amend its complaint to conform to the proof at trial. *See, e.g., Rivera v. Philadelphia Theological Seminary,* 326 Pa.Super. 509, 527, 474 A.2d 605, 614 (1984) (noting that amendments are to be liberally allowed where they "merely vary the cause of action, as originally stated, so that the subject matter remains the same."), *modified,* 510 Pa. 1, 507 A.2d 1 (1986).

■ Bell PA and BAC next assert that a corporate parent and its wholly owned subsidiary cannot, as a matter of law, be held liable for civil conspiracy. Relying on *Copperweld Corporation v. Independence Tube Corporation,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), Bell PA and BAC argue that a parent corporation and its wholly owned subsidiary are essentially one entity and that they are therefore incapable of making an agreement with one another that could serve as the basis for a conspiracy. Initially, we note that *Copperweld*'s specific holding, that a parent cannot conspire with its wholly owned subsidiary, was expressly

---

1. Eastern Telelogic Corp. settled with SCS and a nonsuit was entered on SCS's claim against Eastern in 1995.

2. Although all six remaining defendants are listed as appellants in appeal No. 1264, the claims raised in the appeal pertain only to the tort judgments entered against Bell PA and BAC. *See* Bell PA and BAC's brief at 10.

limited to the Sherman Antitrust Act context. *Copperweld,* 467 U.S. at 776–77, 104 S.Ct. at 2744–45, 81 L.Ed.2d at 647. Nevertheless, Bell PA and BAC argue that the analysis in *Copperweld* should apply equally in the common law conspiracy context. We disagree.

In *Copperweld,* the United States Supreme Court determined that a corporate parent could not, as a matter of law, conspire with a wholly owned subsidiary under § 1 of the Sherman Antitrust Act. *Id.* Significantly, this holding was not based upon a broad, generally applicable examination of the nature of a "conspiracy." Instead, the court focused on the proper meaning of a conspiracy in the context of the Sherman Antitrust Act. This policy-based analysis was explained as follows:

> The appropriate inquiry in this case, therefore, .... is not whether the term "conspiracy" will bear a literal construction that includes parent corporations and their wholly owned subsidiaries. For if these were the proper inquiries, a single firm's conduct would be subject to § 1 scrutiny whenever the coordination of two employees was involved. Such a rule would obliterate the Act's distinction between unilateral and concerted conduct, contrary to the clear intent of Congress as interpreted by the weight of judicial authority. See supra, n. 15, supra. Rather, the appropriate inquiry requires us to explain the logic underlying Congress' decision to exempt unilateral conduct from § 1 scrutiny, and to assess whether that logic similarly excludes the conduct of a parent and its wholly owned subsidiary.

*Id.* at 776, 104 S.Ct. at 2744, 81 L.Ed.2d at 646–47.

Application of this policy based analysis led the Supreme Court to conclude that parent/subsidiary agreements should not come under § 1 scrutiny. Since the parent and the wholly owned subsidiary already share common objectives, agreements between them do not involve a "sudden joining of economic resources that had previously served different interests." Thus, the Court

concluded, there is no real threat to competition and no real justification for § 1 scrutiny. *Id.* at 770–74, 104 S.Ct. at 2741–43, 81 L.Ed.2d at 643–45.[3]

From this limited holding, it does not logically follow that a parent and its wholly owned subsidiary can never be found to have "conspired" in any other context. Although a parent and a wholly owned subsidiary do share common goals, they are still recognized as separate and distinct legal entities. Unique treatment of these separate entities may be justified in the antitrust context because, as the Supreme Court stated, "there is nothing inherently anticompetitive about a corporation's decision to create a subsidiary." *Id.* at 773, 104 S.Ct. at 2742–43, 81 L.Ed.2d at 644. We find no compelling reason, however, to justify a similar *per se* rule ignoring legal corporate form in the common law conspiracy context. In Pennsylvania, "courts will disregard the corporate entity only in limited circumstances when used to defeat public convenience, justify wrong, protect fraud or defend a crime." *Kashner v. Geisinger Clinic,* 432 Pa.Super. 361, 369, 638 A.2d 980, 984 (1994) (quoting *Kiehl v. Action Mfg. Co.,* 517 Pa. 183, 190, 535 A.2d 571, 574 (1987)). The policy behind this general rule is sound:

> [O]ne cannot choose to accept the benefits incident to a corporate enterprise and at the same time brush aside the corporate form when it works to their (shareholders') detriment. The advantages and disadvantages of the corporate structure should be seriously considered and evaluated at the time such organization is contemplated and after incorporation has been selected, the shareholders cannot be heard to argue that the courts should not treat them as a corporation for some purposes and as a corporation for other purposes, whichever suits their present economic interest.

*Sams v. Redevelopment Authority,* 431 Pa. 240, 245, 244 A.2d 779, 781 (1968). Since we see no compelling reason to ignore legal corporate form in the common law conspiracy

---

**3.** Under the Supreme Court's analysis in *Copperweld,* parent/subsidiary activities would still be subject to the mandates of § 2 of the Sherman Antitrust Act relating to unilateral activity. 467 U.S. at 776–77, 104 S.Ct. at 2744–45, 81 L.Ed.2d at 647.

context, we decline the present invitation to extend the *per se* rule of *Copperweld.*[4]

Bell PA and BAC also argue that *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466 (1979), supports their claim of *per se* immunity from civil conspiracy. In *Thompson Coal,* our Supreme Court held that a sole shareholder, director, and officer of a corporation could not conspire with his corporation as a matter of law. *Id.* at 212–13, 412 A.2d at 473. Instantly, however, we are not dealing with an individual and his corporation, but with a corporate parent and its corporate subsidiary. Unlike a sole shareholder/officer/director, who is necessarily involved in every intimate aspect of his corporation, a corporate parent may have varying degrees of involvement with its corporate subsidiary. While it is certainly possible to find a parent/subsidiary arrangement that is as close as the individual/corporate relationship in *Thompson Coal,* it is equally as possible to find a parent/subsidiary relationship that is entirely distant. Thus, we must conclude that the *per se* rule of *Thompson Coal* is inappropriate in the more complex parent/subsidiary context.

By rejecting a *per se* rule in the parent/subsidiary context, we do not mean to imply that every corporate parent will be capable of conspiring with every corporate subsidiary. Under certain circumstances, the arrangement between a parent and its wholly owned subsidiary could be such that the two legal corporations are not truly separate and are essentially corporate alter egos. *See, e.g., Jiffy Lube Inter., Inc. v. Jiffy Lube of Pennsylvania, Inc.,* 848 F.Supp. 569 (E.D.Pa.1994) (discussing application of alterego doctrine in Pennsylvania). In such a case, the parent and the wholly owned subsidiary would not constitute the requisite plurality of actors for civil conspiracy liability. This analysis must take place on a case-bycase basis.

Instantly, the lower court concluded that Bell PA and BAC were separate actors capable of conspiring with one another to tortiously interfere with SCS's contractual relations. The trial court explained its reasoning as follows:

> The Defendants in this case came into being as a result of the antitrust agreement breaking up the Bell telephone system. [1/31/95, n.t. 119–22.] BAC created the subsidiaries Bell of PA and BAP in strict and careful compliance with the antitrust agreement. *Id.* at 154–57. Each entity performs distinct operations, under its own management and with its own goals. Without careful and strict delineation and separation between entities, the entities could violate the antitrust agreement. *Id.*

> Having used the corporate formality so successfully to engage in multiple lines of business yet still remain in compliance with the antitrust agreement, Defendants now claim that this very corporate formality is a fiction and that the various entities are in reality a single actor. However, this Court is persuaded that BAC, Bell of PA and BAP are separate actors, both as a matter of fact and as a matter of Pennsylvania law, and that BAC and Bell of PA are legally capable of conspiring to commit an unlawful act.

Trial court opinion, 3/1/96 at 41. Based upon this record evidence, the trial court did not err in finding that Bell PA and BAC were separate entities. Therefore, we reject Bell PA and BAC's claim of immunity from civil conspiracy liability.

■ In a related argument, Bell PA and BAC assert that they could not be liable for tortious interference because they are privileged to interfere with a subsidiary's contractual relations. For support, Bell PA and BAC cite two Third Circuit cases where the Court held that a parent corporation may, under certain circumstances, direct a subsidiary to breach a contract without liability. *See Advent Systems Limited v. Unisys Cor-*

---

4. Bell PA and BAC correctly note that *Copperweld* has been extended to other contexts by some federal court decisions and by some decisions in other states. *See* Bell PA and BAC's brief at 37 n. 9. In blindly following the rule of *Copperweld,* however, we believe that these cases fail to recognize the unique antitrust themes that supported that decision. Absent a compelling reason to ignore the separate identity of two legally incorporated companies in the common law conspiracy context, we will not adopt the *per se* rule of *Copperweld.*

*poration,* 925 F.2d 670 (C.A.3 1991); *Green v. IUM,* 748 F.2d 827 (C.A.3 1984). Even if we were to adopt a similar rule, however, the trial court properly found that Bell PA and BAC would still not be shielded from liability. The trial court explained its reasoning as follows:

> *Advent* and *Green* simply do not apply to the facts of this case. In both of those cases, the Court of Appeals decided that a corporate parent did not tortiously interfere with a subsidiary's contractual relations because the parent was justified in instructing its subsidiary not to perform contractual obligations which would dissipate corporate assets. In neither of those cases did the corporate parent instruct the subsidiary to abrogate contractual relations with a third party in order to commence those same relations with another subsidiary of the same corporate parent. In neither of those cases did the corporate parent instruct the subsidiary to ignore its contractual relations with a third party and surreptitiously provide services to a corporate "sibling" and which the subsidiary was contractually bound to deliver to a third party. Lastly, in neither *Advent* nor *Green* was the "inducement" directed at a joint venture in which the subsidiary participated.
>
> In the instant case, there was no danger that the Joint Ventures (and thereby BAP or BAC) would lose money or otherwise dissipate assets. In fact, the evidence suggested that, one, the 'sts' concept would be an advantage in the marketing of the subject properties and two, that the 1800 Joint Venture was to receive additional revenues as a result of the $1.25 per square foot rental increase negotiated at the Bell Defendants behest. Clearly, the jury's findings in accordance with the evidence was that BAC's purpose in intervening in the Joint Ventures' affairs was *not* to prevent asset dissipation but, rather, to help its subsidiary, Bell of PA, to aggrandize.

Trial court opinion, 3/1/96 at 42–3 (footnotes and citations omitted). Since we agree with the trial court that Bell PA and BAC were "not acting to protect a 'legitimate concern,' " we must reject the assertion that Bell PA

and BAC were privileged to interfere. *See id.* at 44–45.

■ Bell PA and BAC next argue that the evidence was insufficient to support the conspiracy claim. In order to prove civil conspiracy, one must establish that two or more entities "combined or agreed with intent to do an unlawful act by unlawful means." *Rumbaugh v. Beck,* 411 Pa.Super. 220, 233, 601 A.2d 319, 325 (1991). It must also be established that the conspirators acted with malice. *Id.* All of the above elements may be proven circumstantially, provided that the evidence is "full, clear and satisfactory." *Id.* at 236, 601 A.2d at 327.

Instantly, there was ample evidence to circumstantially prove a conspiracy between Bell PA and BAC. In reviewing the evidence, the trial court explained as follows:

> There was evidence in this case to show that BAC's in-house corporate counsel, in very critical ways, participated in the negotiation of the SCS Agreement executed on September 9, 1986, and did so in a fashion reflecting the interests of Bell of PA. While this was not, in and of itself, improper, the jury could infer evidence critical to Plaintiff's tort claims, including knowledge, unity of interests, and capacity to act in furtherance of common interests. Later, the evidence proves, Bell of PA utilized BAC to gain access to restricted areas in the JFK Buildings despite receipt of process in this lawsuit in September, 1990, followed by service of the Complaint in January, 1991. In this fashion, the willingness to act contrary to known obligations, in concert, was laid forth for the jury's consideration. So too was the ability to do so.
>
> Evidence relating to the nature of Bell of PA's CENTREX product, its use by Bell affiliates tenanted in the Buildings instead of SCS's services (and, in fact, dating from as early as 1986), and Ms. Brown's testimony that Mr. Widerman told her that he was experiencing 'pressure' on behalf of CENTREX not to honor the 'advise' and 'recommend' obligations under the Agreement, all combined to offer the jury evidence from which intent and pur-

pose could be inferred along with further examples of the means to interfere.

Plaintiff's evidence relating to the purposeful technician disarmament of barriers placed in the telephone closets by Mr. Bentsen certainly permitted, within the context of other evidence, the inferences that (i) it was Bell of PA who removed the plexiglass barrier and disarmed the alarm, (ii) Bell of PA was aware that SCS, by virtue at the very least of Bentsen's actions, was asserting a proprietary interest (i.e., the right of 'exclusive access'), and (iii) even if believed to be acting without the specific purpose or desire to interfere, Bell of PA should reasonable have known that interference was certain or substantially certain to occur as a result of its conduct.

The Court also finds that the jury was entitled to believe that a corporate philosophy promoting self-interests over known contractual and/or legal responsibilities pervaded the conduct of these Tort Defendants. Ample trial evidence exists to overcome the Defendants' contention that its various actions were never anything more than justified, simple efforts to service potential Bell of PA customers. In this regard, the relationship between and amongst the parties, motive and conduct, and the interests sought to be advanced by the actors, as presented at trial by Plaintiff, permit the conclusion reached by the jury that the conduct of the Tort Defendants was, indeed, intentional, improper and should not be permitted without liability.

Trial court opinion, 3/1/96 at 28–30 (footnotes omitted). Viewing this record evidence in the light most favorable to SCS, we find sufficient circumstantial evidence to support the jury's finding of a conspiracy between Bell PA and BAC. *See, e.g., Rumbaugh,* 411 Pa.Super. at 232–37, 601 A.2d at 325–27.

■ Next, Bell PA argues that the evidence was insufficient to establish intentional interference with a contract. For the intentional interference claim, SCS had to establish the existence of a contract, an intent on the part of Bell PA to harm SCS by interfering with the contract, an absence of privilege

to interfere and damages resulting from the tortious conduct. *See, e.g., Triffin v. Janssen,* 426 Pa.Super. 57, 62–64, 626 A.2d 571, 574 (1993), *appeal denied,* 536 Pa. 646, 639 A.2d 32 (1994). Referring back to the previously quoted passage of the trial court's opinion, we find ample circumstantial evidence to establish the requisite elements of a contract, an intent to interfere, an absence of privilege and damages. *See* trial court opinion, 3/1/96 at 28–30. Thus, we reject Bell PA's claim of insufficiency with respect to evidence of intentional interference.

■ Finally, Bell PA and BAC argue that SCS was not entitled to recover punitive damages, and that, even if recoverable, such damages were excessive. In Pennsylvania, punitive damages are awarded for "outrageous conduct, that is, for acts done with a bad motive or with a *reckless indifference* to the interests of others." *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 172, 494 A.2d 1088, 1097–98 (1985) (emphasis in original). By repeatedly utilizing their corporate web of interrelated companies to interfere with SCS's right to provide shared tenant services, Bell PA and BAC engaged in conduct that, at the very least, rises to the level of reckless indifference. Accordingly, we reject the assertion that punitive damages were improperly awarded.

■ As for the amount of punitive damages, we find that the award does not shock our sense of justice. *See Lewis v. Pruitt,* 337 Pa.Super. 419, 431, 487 A.2d 16, 22 (1985) ("This court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice."). The trial court stated in its opinion that the "evidence demonstrated a relentless effort on the part of BAC and Bell of PA to supplant Plaintiff at the 1800–80 JFK Buildings." Trial court opinion, 3/1/96 at 30–31. Given the relentless and willful nature of the misconduct, we decline to disturb the jury's judgment that $2,750,000 was an appropriate award of punitive damages.

With respect to SCS's cross-appeal, the sole issue concerns the trial court's molding of the jury verdict against SCS to award interest. In four questions presented, SCS

disputes the trial court's decision to partially grant post-trial motions so as to award overdue interest to 1800 JFK Joint Venture.

Initially, we find that questions two and four were not properly preserved for appellate review. In question two, SCS argues that the trial court should not have molded the verdict to award interest without considering the "parties' respective equities." SCS's brief at 3. SCS did not, however, present this claim to the trial court in response to post-trial motions asking for a molded award of interest. Since the issue is now being raised for the first time on appeal, we find it to be waived. *See, e.g., Reilly v. Southeastern Pennsylvania Transp. Authority,* 507 Pa. 204, 214, 489 A.2d 1291, 1296 (1985). Similarly, in question 4, SCS argues for the first time that compound interest is improper when it is not provided for in a clear contract provision. This claim is also waived. *See id.*

In question one, SCS asserts that it could not owe overdue interest because the rent "due date" did not occur until the jury in the trial below set the fair market value. We disagree. The base rent of the occupied premises, defined as the fair market value as of April 10, 1990, was due on a monthly basis. While the parties may have disagreed over the exact amount due, the trial court properly noted, "Pennsylvania does not recognize a bona fide contest of the amount due as an impediment to the obligation to tender on a timely basis." Trial court opinion, 3/1/96 at 62 (citing *Burkholder v. Cherry,* 414 Pa.Super. 432, 435–37, 607 A.2d 745, 747 (1992)). Accordingly, we cannot accept SCS's assertion that the "due date" did not occur until the jury's verdict resolved the parties dispute and set a fair market value for the property.

Finally, SCS argues that 1800 JFK Joint Venture failed to provide sufficient evidence to establish the proper contract rate of interest. On this matter, we simply agree with the trial court that "the Joint Venture's uncontested evidence [on the proper contractual rate of interest], while perhaps not of the highest quality, was not so indefinite as to require the jury to speculate on an amount." Trial court opinion, 3/1/96 at 63.

We therefore reject SCS's final challenge to the trial court's award of $83,068.51 in overdue interest.

Since the parties have failed to establish the merits of their respective claims of error, we affirm.

Judgment Affirmed.