FISHER, Circuit Judge,
dissenting in part.
I join all but Sections III-C-2 and III— C-3 of the opinion of the Court. I part ways with the majority on the question of the sufficiency of the evidence to support the punitive damages jury instruction. I believe the majority misapplies the standard for punitive damages under Pennsylvania law and, in so doing, unduly waters down the necessary showing to support a punitive award.
Punitive damages are an “extreme remedy.” Martin v. Johns-Manville Corp., 508 Pa. 154, 494 A.2d 1088, 1098 n. 14 (1985) (plurality opinion), abrogated on other grounds by Kirkbride v. Lisbon Contractors, Inc., 521 Pa. 97, 555 A.2d 800 (1989). They “are penal in nature and are proper only in cases where the defendant’s actions are so outrageous as to demonstrate willful, wanton[,] or reckless conduct.” Hutchison ex rel. Hutchison v. Luddy, 582 Pa. 114, 870 A.2d 766, 770 (2005). As noted correctly by the majority, for reckless conduct to support a punitive award, the plaintiff must show “that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act ... in conscious disregard of that risk.” Id. at 772. Grossly negligent conduct is insufficient. Martin, 494 A.2d at 1098. So, as stated by the majority, to affirm the District Court’s decision to instruct the jury on punitive damages, “we must find evidence in the record that Intertek actually knew its conduct was placing Brand at risk of harm.” Maj. Op. 360.
Put simply, I believe the evidence in this case does not justify a punitive damages award. Like the majority, I believe Frederick Curkeet’s testimony is vital. I agree further that Curkeet’s testimony shows that Intertek understood its important role of preventing unsafe products from reaching the marketplace and that companies and consumers alike relied on Intertek to perform this role properly. But Intertek’s knowledge of this general risk of harm is not enough; the evidence must show that Intertek knew its specific conduct in this case placed Brand at risk of harm. See generally Martin, 494 A.2d at 1099-1100 (holding that knowledge of general safety risks posed by asbestos was not enough to show subjective appreciation of the specific risks faced by insulation workers installing asbestos). I also acknowledge that Cur-keet testified to instances where Intertek engineers had made “pretty major mistakes” and “slack[ed] off on the job and sa[id] things complied without running the test,” App. 841-42, but I note the absence of any specifics regarding the nature and circumstances of these mistakes. The majority attempts to fill this absence, but I think it requires us to reverse.
The majority overstates much of Cur-keet’s testimony. First, the majority re *368 lies on Curkeet’s admission that Intertek did not always have “best practice documents,” i.e., one set of forms used by every Intertek lab that spelled out specifically how to run a particular safety test, and instead sometimes relied on labs to create their own forms locally for a specific test. App. 802. This testimony may show that Intertek knew that it was not perfect (what company is?) and had room to improve (what company doesn’t?), but it does not show that Intertek knew that relying on labs in some cases to create their own forms placed Brand at risk of harm. The majority speculates that “problems had arisen in the past as a result” of these “testing process ... holes,” Maj. Op. 362, but Curkeet never testified that the lack of standard forms had ever caused the kinds of mistakes that occurred in this case. The lack of rigorous uniformity does not equate to recklessness, and if an admission of imperfection or lack of absolute uniformity opens the door to punitive damages whenever something goes wrong, Pennsylvania companies may be in for a rude awakening.
Nor do I agree with the majority that the punitive damages instruction is supported by Intertek’s decision to test the Thermablasters in China using standards written in English. The majority relies on Curkeet’s admission that Intertek’s Chinese engineers had “ ‘obvious’ ” problems with the English language. Maj. Op. 361-62. What Curkeet actually said, however, was far more innocent. He said that In-tertek’s Chinese engineers “are essentially trained in engineering in English for the most part”; that “their knowledge of English, written English and technical English!,] is actually very good”; and that “they certainly have the training to deal with [the] English language in engineering functions,” though they may not write English as easily as native speakers. App. 800-01. As for the decision not to translate the standards into Chinese, Curkeet explained that Intertek decided it was better for Chinese engineers to work with English standards based on its assessment that the “specific terminology” in the English safety standards would not “translate to Chinese ... very well.” App. 801. He also said that, in his experience, the Chinese engineers “have been very able” to deal with English safety standards. Id. So although Curkeet admitted it was' “obvious” that English was not the Chinese engineers’ first language, nothing in his testimony suggests that Intertek knew that it placed Brand at risk of harm by having Chinese engineers apply English standards.
The majority finds additional evidence of Intertek’s reckless conduct because, according to the majority, this was not a “one-time issue” given Curkeet’s testimony about engineers slacking off and failing to correctly run tests. Maj. Op. 361-62. But again, Curkeet never said what these past mistakes entailed and certainly never said they involved translation issues, so these prior bad experiences do not show that Intertek subjectively appreciated a risk of harm created by any , translation issues here. Additionally, in rejecting Intertek’s argument that it chose not to translate the safety standards from English to Chinese to avoid “ ‘lost jargon,’ ” the majority concludes that Intertek’s choice actually shows that Intertek subjectively appreciated the risk of harm to Brand from any language issues. Maj. Op. 361-62 n. 3. I disagree. If anything, it shows that Inter-tek decided a risk existed (perhaps incorrectly) and avoided it, not the other way around. I therefore fail to see where the evidence is that Intertek knew that it placed Brand at risk of harm by having Chinese engineers interpret English standards.
Finally, the majority finds support for the punitive damages instruction in Cur- *369 keet’s acknowledgment that the safety-standard at issue was new and complex, yet the testing proceeded without Cur-keet’s direct supervision or instructions. I might agree with the majority if Curkeet testified that he knew at the time that he needed to instruct the engineers to seek his personal help to interpret this standard or that Intertek had any prior bad experiences testing to new safety standards. But Curkeet only said he would do things differently in retrospect and never mentioned any prior bad experiences with new standards, instead noting that Intertek “regularly” worked with new standards. App. 855.
In sum, Brand pursued a negligence claim and presented sufficient evidence to support that claim. Although Pennsylvania law permitted Brand to go the extra mile by proving not just negligence but outrageous conduct to support a punitive damages award, see Hutchison, 870 A.2d at 772, I simply believe Brand came up short.[1]
I respectfully dissent.

. Because I conclude that the evidence was insufficient for the District Court to instruct the jury on punitive damages, I would not reach Intertek's constitutional challenge to the punitive damages award,